**In The Matter Of:**

*Larry Beer, et al. v.*

*The Travelers Home and Marine Insurance Company*

*Deposition of Larry E. Beer*

*January 28, 2020*



Excellence In Court Reporting

*Original File Beer Larry 1-28-20.txt*

*Min-U-Script® with Word Index*

Page 5

```
 1   Exhibits Identified:                            Page
 2   28   4/9/2018 letter to Larry and                140
          Sharon Beer from Ryan Conklin
 3
 4   29   10/16/2018 letter to Larry and              155
          Sharon Beer from Ryan Conklin
 5   30   Benchmark Hail History Report               158
          dated September 10, 2018
 6
 7   31   Proposed Settlement Amounts                 162
 8        (The original exhibits were attached to the original
          transcript, and copies were provided to counsel)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24             (The original transcript was filed with
25                  Attorney Brian E. Devilling)
```

Page 6

```
 1           LARRY E. BEER, called as a witness,
 2       being first duly sworn, testified on oath as
 3       follows:
 4
 5               EXAMINATION
 6   By Mr. Devilling:
 7   Q   Mr. Beer, my name is Brian Devilling.  I represent
 8       Travelers in this case.
 9          Have you ever given a deposition before?
10   A   No.
11   Q   How about an examination under oath?
12   A   No.
13   Q   Just a few background, kind of ground rules.  If
14       you don't understand a question I ask, just let me
15       know, and I'll rephrase it.
16   A   Okay.
17   Q   If you can answer yes or no as opposed to uh-huh
18       or uh-uh, it just makes it easier for her to
19       transcribe, okay?
20   A   Yes.
21   Q   All right.  And if you need a break at any time,
22       let me know, all right?
23   A   Okay.
24   Q   For any reason.  If you need to go to the bathroom
25       or just need a drink of water or talk to your
```

Page 7

```
 1       attorney, we can always take a break, okay?
 2   A   Okay.
 3   Q   Finally, if you could, wait to give your answer
 4       until I'm done asking my question.  If both of us
 5       are talking at the same time, it again makes it
 6       very hard for her to transcribe, okay?
 7   A   Okay.
 8   Q   All right.  What's your current residential
 9       address?
10   A   610 10th Street, Fennimore, Wisconsin.
11   Q   How long have you lived there?
12   A   35 years.
13              MS. BEER: 36.
14   A   36 years.
15   Q   All right.  What's your highest level of
16       education?
17   A   I worked on my master's when I was teaching in
18       order to pick up credits, so it's a bachelor's
19       plus credits.
20   Q   Bachelor's plus some credits towards a master's?
21   A   Right.
22   Q   All right.  Where did you get your undergraduate
23       degree?
24   A   University of Wisconsin-Platteville.
25   Q   What was your major?
```

Page 8

```
 1   A   Industrial technology and a minor in safety.
 2   Q   And you said you were working toward a master's.
 3       What were you working towards?
 4   A   In industrial technology.
 5   Q   And you were a teacher?
 6   A   Yes.
 7   Q   All right.  Are you still a teacher?
 8   A   No.
 9   Q   How long have you been retired?
10   A   Ten years.
11   Q   Were you a teacher your entire professional life,
12       or did you have other jobs?
13   A   No.  I owned a business for 18 years.
14   Q   What business was that?
15   A   It was an auto body repair shop.
16   Q   What sorts of things did you study with an
17       industrial technology degree?
18   A   Plastics, construction, welding, education,
19       drafting.
20   Q   So you do have a little bit of construction
21       experience then --
22   A   Yes.
23   Q   -- in your background?
24          All right.  Did you ever have any
25       professional license?
```

Page 13

1  A  I'm going to say probably five to six years ago.
2     It was just a couple years before the hailstorm.
3  Q  All right.  So the siding that's on the house
4     today, is that the same siding that was on there
5     when you bought the house?
6  A  The siding that's on there is 112-year-old cedar
7     shakes.
8  Q  And when did you build that garage?
9  A  '07.
10        MS. BEER: '97.
11  A  Oh, I'm sorry.  '97.
12  Q  All right.  So the garage is approximately
13     23 years old, 22 years old at this point?
14  A  Yeah.
15  Q  And is it still the same siding that's on the
16     garage that you put on when you built it?
17  A  Yes.
18  Q  What kind of siding is on the garage?
19  A  It's clear cedar shake.  It matches the house.
20  Q  Now, you said that you replaced the roof on the
21     house in 2009.  How old is the roof on the garage?
22  A  Same time.  I replaced both of them.
23  Q  What was the reason that you replaced the roof in
24     2009?  Was it related to storm damage, or was it
25     just getting old and needed replacement?  What was

Page 14

1     it?
2  A  A problem with Certain Teed shingles.
3  Q  Did Certain Teed pay to replace the roofs?
4  A  $300 worth.
5  Q  What was the issue with the old shingles?
6  A  They deteriorated.  They cupped.
7  Q  Within the last -- let's start with the house.
8     Within the last ten years prior to the hailstorm,
9     have you done any other renovations to the
10     exterior of the house?
11  A  Windows.
12  Q  When did you replace windows?
13  A  Probably five years ago.
14  Q  Any other renovations to the exterior of the house
15     in the last ten years?
16  A  Well, it's a 112-year-old home, so repairs are
17     needed frequently.
18  Q  Okay.
19  A  I mean, it's a beautiful old home, so to keep on
20     top of it you need to make repairs.
21  Q  Any larger property components on the exterior of
22     the house totally replaced in the last ten years
23     other than the windows?
24  A  No.
25  Q  How about on the garage?

Page 15

1  A  No.
2  Q  The windows on the garage, are they still
3     original?
4  A  Yes.
5  Q  There's a large antenna on the side of the house,
6     right?
7  A  Yes.
8  Q  Television antenna, correct?
9  A  Yes.
10  Q  When was that first installed?
11  A  Probably back in '83, 1983.
12  Q  So as of the date of the hailstorm, was that the
13     original antenna from 1983?
14  A  No.
15  Q  When was the -- the one that was on the house on
16     the date of the hailstorm, March 23, 2017, when
17     was that one installed?
18  A  It was probably four years old.  And that was the
19     second antenna.
20  Q  All right.  Since you've owned the house, so for
21     the last 36 years, do you recall hailstorms at the
22     property other than the March 23, 2017 hailstorm?
23  A  I remember one.  It was -- I don't have any date
24     on it at all, but it was before.
25  Q  Do you remember the year?

Page 16

1  A  No.
2  Q  Can you isolate it to maybe a five- or ten-year
3     period?
4  A  No.
5  Q  Do you recall how large the hail was during the
6     other storm?
7  A  No.
8  Q  Do you recall whether that -- well, first of all,
9     the other hailstorm that you remember, was it
10     before or after March 23?
11  A  Before.
12  Q  Do you recall if that hailstorm caused any damage
13     to your property?
14  A  I don't recall.
15  Q  Between 2009 when the roofs were installed and
16     March 23, 2017, do you know about how many times
17     you had been up on the roof?
18  A  Probably every year I tried to get up there, or I
19     send one of my boys up for maintenance, chimney
20     maintenance and --
21  Q  Would you ever go up there specifically to inspect
22     the roof surface for damage?
23  A  No.  I don't climb anymore.
24  Q  So what kind of chimney maintenance would you do
25     when you went up on the roof?

Larry Beer, et al. v.
The Travelers Home and Marine Insurance Company

Deposition of Larry E. Beer
January 28, 2020

Page 21

1 had been a hailstorm in Fennimore on March 23,
2 2017?
3 A Same day.
4 Q How did you learn that?
5 A Somebody called and told us.
6 Q Do you remember who?
7 A No.
8 Q Whoever called you and told you about the storm,
9 did they tell you about any damage to your house?
10 A They just said that a lot of homes were damaged in
11 the area and that I'll have a job when I get home.
12 That part I do remember.
13 Q I'm sorry. You'll have what when you get home?
14 A I'll have a job when I get home, meaning that I
15 would have to work with the insurance company and
16 contractors in order to get the place fixed back
17 up.
18 Q Did you talk to -- well, when did you get back
19 home?
20 A A week later, maybe not quite, five days. I've
21 got no idea.
22 Q And when you got back home, did you inspect the
23 house to see if there was hail damage?
24 A Walked around it, yes.
25 Q When did you observe?

Page 22

1 A That there was damage to my house, so I got ahold
2 of the insurance company.
3 Q And I'm assuming that was damage that was not
4 there before you left for Florida?
5 A Yes.
6 Q All right. And at that point you presented the
7 insurance claim to Travelers?
8 A Yes.
9 Q Okay.
10 A Yes.
11 Q Did you go up on the roof to look at --
12 A Actually --
13 Q -- the roof?
14 A -- I turned it into TRICOR Insurance, who was the
15 carrier, and TRICOR turned it in to Travelers.
16 Q Was TRICOR your insurance agent?
17 A Yes.
18 Q All right. And who was your main contact at
19 TRICOR?
20 A I don't remember without looking at my records.
21 Q We'll look at a few e-mails and stuff later today.
22 MR. KNOKE: Off the record.
23 (Discussion off the record)
24 Q When you returned from Florida, did you go up on
25 your roof?

Page 23

1 A No.
2 Q Let me ask that question a little more clearly.
3 When you returned from Florida and you were
4 walking around your house looking at the damage,
5 did you go up on your roof?
6 A No.
7 Q Did you ever go up on your roof after that storm?
8 A No.
9 Q Have you personally observed damage up on the roof
10 since the March 23, 2017 hailstorm?
11 A No. I'm going to say something different than
12 that. Yes, because I had contractors there with
13 chalk, and they circled the areas where the
14 bruising was that the hailstorm created.
15 Q Okay.
16 A Also, I had a state licensed building inspector
17 there after I was having problems with the
18 insurance company --
19 Q Okay.
20 A -- go up there. And he also marked out the spots
21 where the hail damage were.
22 Q Okay.
23 A So between the contractors and the licensed
24 building inspector and -- I guess that would be
25 it, the different contractors that I had.

Page 24

1 Q So those gentlemen did chalk circles around where
2 they found hail damage?
3 A Yes. They're the pros.
4 Q And you could see the chalk circles from ground
5 level?
6 A Yes.
7 Q All right. And other than that, did you
8 personally observe any hail damage on the roof?
9 A Not on the roof, but I had -- Star Builders came
10 to the house, and they pulled shingles off that
11 were sent to GAF for analysis.
12 Q And so you saw the shingles that they had pulled
13 off?
14 A When they were down, yes. I took care of
15 packaging them and mailing them.
16 Q How would you describe the appearance of that
17 shingle that you pulled off to send to GAF?
18 A It was bruised. Granules were falling off. Yeah,
19 you could tell that it had hail damage.
20 Q And can you tell me about how wide the bruise was
21 on that shingle?
22 A No.
23 Q Once you got back from Florida, did you speak with
24 neighbors about the hailstorm?
25 A Yes.

Larry Beer, et al. v.
The Travelers Home and Marine Insurance Company

Deposition of Larry E. Beer
January 28, 2020

Page 29

1 Q  And my records show that Travelers received notice
2    on April 5, 2017.  Do you dispute that being the
3    date of notice?
4 A  No, I don't.
5 Q  Okay.
6 A  No.  Sorry.
7 Q  And after providing notice Travelers reached out
8    to you to schedule an inspection, correct?
9 A  Correct.
10 Q  And my records show that the initial inspection
11    was scheduled for April 12, 2017; is that correct?
12 A  I don't remember the dates that well.
13 Q  Do you disagree that it was April 12, 2017, or you
14    just --
15 A  No.
16 Q  -- don't remember?  Okay.
17 A  I don't remember.
18 Q  Do you recall that Kathryn -- at that time I
19    believe her name was Kathryn McCombs -- came out
20    to your property?
21 A  Yes.
22 Q  Later known by Kathryn Parker?
23 A  Yes.
24 Q  During the initial inspection in early April of
25    2017, were you present?

Page 30

1 A  Yes.
2 Q  Okay.
3 A  I'd like to mention something, that she had made
4    an appointment, then changed it again.  That was
5    part of the delay --
6 Q  Okay.
7 A  -- from the time she was there from the hailstorm.
8 Q  All right.  The date that I see on the first
9    Travelers estimate was April 12, 2017.  Do you
10    know whether the initial inspection that Travelers
11    did was before April 12, 2017, or was it after, if
12    you know?
13 A  I don't know.
14 Q  Okay.
15 A  No.
16 Q  Other than you and Ms. McCombs, was anyone else
17    present during the inspection?
18 A  Not the initial inspection, no.
19 Q  What do you recall about the initial inspection
20    with Ms. McCombs?
21 A  She seemed to have a chip on her shoulder.
22 Q  What do you mean by that?
23 A  Negative, short answers, didn't want to have a
24    discussion on anything.
25 Q  Do you remember any specific conversations with

Page 31

1    her, any examples of chips on her shoulder or
2    short answers or her being negative?
3 A  I remember telling her about the TV antenna, which
4    she left off the first estimate.
5 Q  Did she go up on the roof?
6 A  Yes.
7 Q  And did she walk around and look at all sides of
8    the house and the garage?
9 A  Yes.  The damage was on the south side and east
10    side of both the house and the garage.
11 Q  Okay.
12 A  And pergola.
13 Q  And I actually should have asked you that earlier.
14    When you got back from Florida and first looked at
15    the property, what parts of the property did you
16    see damage on?
17 A  Well, it was pretty evident because there were --
18    there were dents in the siding.  There was dents
19    in the doors.  There was dents in the windows.
20    Screens were marred.
21 Q  Did you see damage to the antenna?
22 A  No, other than I know it's made out of aluminum
23    and that the hail was big enough that I'm sure it
24    tattered it.
25 Q  What property components did you later find to be

Page 32

1    damaged that you did not notice when you first got
2    back from Florida?
3 A  As time went on, other things started showing up.
4    And I don't remember the chronological order as to
5    when we found them and when I mentioned it to
6    them.
7 Q  When you got back --
8 A  Because it's --
9 Q  I'm sorry.  Go ahead.
10 A  -- terribly hard to find everything at one time.
11 Q  What do you mean it's terribly hard to find
12    everything at one time?
13 A  Well, if you don't -- if you're not looking for
14    it, you may not notice it until later.  Like, the
15    pergola, I didn't walk back by the pergola because
16    it's on the northwest corner of the garage.  But
17    later on when I went there, definitely damage to
18    it.
19 Q  I think there was a wind spinner too that you
20    noticed was damaged later on?
21 A  Yes.
22 Q  Was there also a fire ring cover that you noticed
23    was damaged later on?
24 A  Yes.
25 Q  Anything else specific you recall that you noticed

Page 37

1  A  One thing -- no.
2  Q  Okay.
3  A  But one thing that was said was different roofs
4     will stand up better to damage.
5  Q  And who told you that?
6  A  The roofers.
7  Q  In terms of your neighbors' roofs in the area that
8     were getting replaced, do you know what kind of
9     roofs they had on their houses?
10 A  Asphalt.
11 Q  Asphalt.  Okay.  Beyond the fact that they had
12    asphalt shingle roofs, do you know any more
13    specifics?
14 A  No.
15 Q  Do you know who their insurers were?
16 A  No.
17 Q  Do you know anything about what was in your
18    neighbors' insurance policies?
19 A  Pardon me?
20 Q  Do you know anything about what was in your
21    neighbors' insurance policies?
22 A  No, because it's not my business.
23 Q  Do you know how old your neighbors' roofs were?
24 A  No.
25 Q  Any other specific conversations that you remember

Page 38

1     with Ms. McCombs at Travelers' initial inspection?
2  A  No.
3  Q  Any other specific examples that you can give me
4     supporting your belief that Ms. McCombs had I
5     think you said a chip on her shoulder and was
6     negative during the inspection?
7  A  Just the usual indications of short answers.
8  Q  Were there any property components you wanted
9     Ms. McCombs to look at that she refused to look
10    at?
11 A  Yes.
12 Q  What was that?
13 A  That TV antenna.
14 Q  So you asked her specifically to look at the TV
15    antenna?
16 A  I did.
17 Q  Did she look at it?
18 A  No.
19 Q  Were you with her during the entire inspection?
20 A  Yes.
21 Q  Were you with her --
22 A  Most of it.  I wasn't up on the roof.
23 Q  Can you see the TV antenna from the roof?
24 A  Yeah.
25 Q  Did you see -- did she go near the TV antenna

Page 39

1     while she was on the roof?
2  A  No.  It's probably 30 feet taller than the roof or
3     more, maybe 40 feet.  I've got no idea.
4  Q  Do you know why she did not inspect the TV
5     antenna?
6  A  No.
7  Q  I'll show you what we'll mark as Exhibit 1.
8         (Exhibit No. 1 marked for
9          identification)
10 Q  Do you recall receiving the letter that we've
11    marked as Exhibit 1?
12         MR. KNOKE: Can I take a look at
13    it?
14         MR. DEVILLING: I'm sorry.  I only
15    brought two copies.
16         MR. KNOKE: Just off the record
17    here.
18         (Recess)
19 Q  My only question about Exhibit 1 there is just do
20    you recall receiving that letter?
21 A  I don't recall it, but I may have.
22 Q  Suffice to say that you felt that the payment that
23    Travelers was making was too low, right?
24 A  Yes.
25 Q  And after that you went about obtaining some

Page 40

1     estimates from various contractors for --
2  A  No.
3  Q  -- repairs?  Okay.
4  A  Before that I got estimates from different
5     contractors so that I knew ahead of time what was
6     going to be taken care of.
7  Q  Okay.
8  A  Or what should be taken care of.
9  Q  When you and Ms. McCombs or Ms. Parker were
10    inspecting the property -- this is on Travelers'
11    first inspection -- were there areas where she
12    acknowledged that there was hail damage?
13 A  Yes.
14 Q  And where were those areas?
15 A  The first that we started with was hail damage to
16    the front of the house, the siding.  And it was
17    evident that there were dents in the cedar shakes,
18    and the paint was split.  And I showed it to her.
19    And in that discussion she said that the dents
20    could be filled in.  And understand I was a paint
21    rep for Sherwin-Williams for close to two years,
22    and I knew that you don't fill in dents in the
23    siding of a house.
24 Q  Were the cedar shakes prior to the storm, were
25    they stained or painted?

Larry Beer, et al. v.
The Travelers Home and Marine Insurance Company

Deposition of Larry E. Beer
January 28, 2020

Page 45

1 Q   And then there was a dispute over the sort of
2     repair or painting method to the siding, correct?
3     Is that right?
4 A   Yes.
5 Q   And then there were -- was there a dispute as to
6     hail damage to any of the doors or windows?
7 A   Yes.
8 Q   Can you describe that dispute.
9 A   Oh, dispute between them?
10 Q   Yes.
11 A   I don't remember that.
12 Q   And at that point had you noticed -- I'm sorry.
13     Go ahead.
14 Q   Now we're talking between her estimate?
15 A   Yes.
16 A   Okay.  Her estimate didn't follow through with any
17     of the bids that I got.  They weren't even close.
18     So I guess that would have been a dispute.
19 Q   As of April 13, 2017, had you noticed damage to
20     the pergola wind spinner or fire ring cover?
21 A   I don't remember when I turned it in, when I
22     mentioned it.
23 Q   You went out, and you got an estimate from
24     Chamberlain Electric for the antenna, correct?
25 A   Correct.

Page 46

1 Q   And who did you -- you dealt with Gary Chamberlain
2     from Chamberlain Electric, right?
3 A   I did.
4 Q   His initial estimate was for $611.69; is that
5     right?
6 A   I guess, yes.
7 Q   On his estimate he notes "The above items were
8     damaged due to high winds and hail."  Do you
9     remember if he did an inspection of the antenna to
10     make that determination?
11 A   He did.
12 Q   What did he do?  Did he climb up on the --
13 A   He climbed up.
14 Q   And what did he tell you he saw up there?
15 A   Hail damage and wind damage to the antenna.
16 Q   He told you he saw some dents up there?
17 A   He told me.
18 Q   So, in other words, the notation in his estimate
19     regarding hail damage, that's not based on just
20     what you told him; that's based on his inspection
21     of the antenna to your knowledge?
22 A   He's the professional.
23 Q   Do you recall having someone from Goodman Gutters
24     come out to the property?
25 A   Yes.

Page 47

1 Q   We'll mark this as an exhibit.
2 A   Can I mention something about the antenna?
3 Q   Sure.
4 A   She wasn't happy with the price of the antenna,
5     and she called Chamberlain up and wanted invoices
6     as to what I paid for the antenna and the work
7     that was done before.  And Chamberlain told her --
8     this is what Chamberlain told me -- that it was
9     none of her business.  And he hung up on her
10     because she was very rude.
11 Q   At some point Chamberlain told you that they did
12     not want to do the work, correct?
13 A   Correct.
14 Q   What did they tell you about that?
15 A   That he wasn't going to work with an insurance
16     company that acted like that and that he didn't
17     need the headaches.
18 Q   Okay.
19 A   So I had to find somebody else to do it.
20 Q   And what did he tell you Ms. Parker had requested
21     from him?
22 A   I just told you.
23 Q   That was the original price of the antenna,
24     correct?
25 A   Right.

Page 48

1 Q   Did Mr. Chamberlain complain to you about anything
2     else that Ms. Parker requested during her call?
3 A   No.  But when I -- understand that I was without
4     TV for over three months, and I wanted that
5     antenna fixed.  And I was going to pay for it
6     myself until the settlement went through, and
7     that's when Chamberlain told me that he really
8     wasn't interested in fixing it if he had to deal
9     with the insurance company.
10 Q   Okay.
11 A   So I went and got a second estimate.
12 Q   The RadioShack estimate?
13 A   RadioShack estimate.  And they charged for an
14     estimate.  And they came up, and they wrote an
15     estimate on it, which was higher than
16     Chamberlain's.
17 Q   Has the antenna been replaced?
18 A   Yes.
19 Q   Who did the work?
20 A   I had Chamberlain.  I calmed him down, told him
21     that he had always done business with me, and he
22     said that he would do it for me but not the
23     insurance company.
24 Q   And did he do it for the amount in his original
25     estimate?

Larry Beer, et al. v.
The Travelers Home and Marine Insurance Company

Deposition of Larry E. Beer
January 28, 2020

---

Page 53

1    the documentation, on the back of Exhibit 3 are
2    the technical papers that explains why his
3    decisions were the way they were.
4  Q  And when did Mr. Culbertson first come out to the
5    property to meet with you?
6  A  I don't know. I can't remember.
7  Q  It would have been sometime between the date of
8    the storm and April 28, 2017, though, right?
9  A  Yes.
10 Q  All right. So is it your understanding that
11    Mr. Culbertson was providing his recommendations
12    for how to repaint in this letter?
13 A  He's the professional.
14 Q  So Mr. Culbertson with respect to the cedar shake
15    siding on the home recommended pressure washing,
16    any dents from hail damage to be filled with wood
17    filler/patch, and then any areas that are filled
18    in to be spot primed, and then repaint the
19    two sides with Duration Exterior satin acrylic
20    paint, correct?
21 A  If that's what's on it.
22 Q  How did that differ from what Travelers was
23    willing to provide -- or pay for?
24 A  I don't know.
25 Q  Okay.

---

Page 54

1  A  It must have been quite a difference because the
2    price was fairly off.
3  Q  All right. And then with respect to the garage
4    siding -- I don't know if I asked you this
5    earlier, but the siding on the garage, was that
6    painted or stained?
7  A  It was natural.
8  Q  So it looks like Mr. Culbertson offered
9    two options with respect to the garage siding; is
10    that right?
11 A  Yes.
12 Q  He said "achieving a uniform, natural stained look
13    will be very difficult because of the condition of
14    the wood," correct?
15 A  It had aged, yes.
16 Q  All right. And was that a cedar product that was
17    on the garage?
18 A  Pardon me?
19 Q  Was it a cedar product on the garage?
20 A  Cedar shakes just like what's on the house.
21 Q  He also offered an alternative of painting over
22    the siding, correct?
23 A  Yes.
24 Q  And it said that that option was discussed and
25    approved by the customer/owner. That was you,

---

Page 55

1    correct?
2  A  Yes.
3  Q  Okay.
4  A  With the understanding that I would have to pay to
5    have the rest of the garage painted, which was
6    fine.
7  Q  And that was because the rest of the garage was
8    still natural, and you wanted to paint it to look
9    uniform, correct?
10 A  It was because the rest of the garage wasn't hail
11    damaged, the west and the north side.
12 Q  Right. What he said was if they were painted the
13    cedar shakes would need to be pressure washed,
14    lightly sanded in some areas, and then caulked,
15    correct?
16 A  I don't know about some areas, but yes, needed to
17    be sanded.
18 Q  Okay.
19 A  Primed, caulked, and then painted.
20 Q  I don't see in this document a price quote. Do
21    you know what price he quoted you for this?
22 A  He didn't. He's a paint rep. He doesn't do the
23    work.
24 Q  Did you ultimately have it quoted --
25 A  I did.

---

Page 56

1  Q  -- to repaint it? Okay. I think we'll get to
2    that.
3  A  I believe it was H&H Painting that uses
4    Sherwin-Williams' products out of Lancaster.
5  Q  That was my next question. We'll mark this as
6    Exhibit 4.
7  A  Yes. This gentleman with Sherwin-Williams is a
8    paint rep, not a contractor.
9          (Exhibit No. 4 marked for
10           identification)
11 Q  So is Exhibit 4 the H&H Painting, LLC estimate?
12 A  Yes.
13 Q  And they were proposing to do this work for
14    $14,675; is that right?
15 A  Yes.
16 Q  And this proposal -- well, first of all, has the
17    siding been repainted? As of today, has it been
18    repainted?
19 A  The siding, no.
20 Q  The cedar shakes, have they been repainted?
21 A  No. There is some trim and trellises that have
22    been painted.
23 Q  And who -- I'm having trouble making out the
24    signature at the bottom. Do you remember the name
25    of the individual from H&H Painting who provided

---

Larry Beer, et al. v.
The Travelers Home and Marine Insurance Company

Deposition of Larry E. Beer
January 28, 2020

---

**Page 61**

1    and garage!," correct?
2  A   Yes.
3  Q   All right.  "Damage to ridge vent and east sides
4        of roof!," correct?
5  A   Yes.
6  Q   Did you have any discussion with Mr. Reifschneider
7        as to whether the hail damage that he was
8        referencing there could be repaired on a
9        shingle-by-shingle basis as opposed to replacing
10       the whole roof?
11 A   I didn't have any discussion with that.  His
12       suggestion was to replace the whole roof.
13 Q   Do you know why he suggested replacing the whole
14       roof?
15 A   I have no idea.
16 Q   Okay.
17 A   Every roofer that I had there looking at the house
18       was to replace it.  They all wanted to replace the
19       whole roof.
20 Q   And which other roofers did you have there looking
21       at the house?
22 A   One from Prairie du Chien and one from Lancaster,
23       I believe.
24 Q   I think we talked about those folks earlier,
25       correct?

---

**Page 62**

1  A   I think so, yeah.
2  Q   All right.  And you didn't recall what companies
3        those were?
4  A   Right.
5  Q   Had you ever worked with TruHome before?
6  A   No.  The reason I called TruHome is because they
7        were in the area replacing roofs from the
8        hailstorm.
9  Q   All right.  Did they approach you, or did you
10       approach them?
11 A   I approached them.
12 Q   Do you recall who you learned about TruHome from?
13 A   Like I said, they were in the area.  Their trucks
14       were marked.  I approached them.
15 Q   Did TruHome ever make any promises to you to,
16       like, represent you in your insurance claim or
17       anything like that?
18 A   They said they'd answer any questions that came
19       up.
20 Q   Did they ever --
21 A   We also had a discussion as to the type of shingle
22       that was on the roof.  I wanted they to know that
23       it was a lifetime warranty roof, and they said No
24       problem.  They have done them type of roofs
25       before.

---

**Page 63**

1  Q   The roof that you had on there, do you know what
2        kind it was in terms of whether it was a three-tab
3        roof or some other sort of roof?
4  A   I do.  It was -- I've got to stop and think of the
5        name.  Not a three-tab.  It was an architectural
6        style.
7  Q   Do you know what the thickness of the shingles
8        that you had on the roof was?
9  A   I don't know, but it was a lifetime warranty.  I
10       also know that when the shingles came, instead of
11       three bundles to a square, it was four bundles to
12       a square.  Because the weight of the shingle was
13       so much more, I questioned that when they came.
14 Q   Did you observe Mr. Reifschneider when he was up
15       on your roof?  Actually, let me --
16 A   I guess I looked up on the roof to see him up
17       there.
18 Q   Strike that question.  I should have asked this
19       first:
20           Did Mr. Reifschneider go up on your roof?
21 A   Yes, he did.
22 Q   All right.  And did you see him when he was up on
23       the roof?
24 A   Yes, I did.
25 Q   Did you see where he went on the roof?

---

**Page 64**

1  A   Yes, I did.
2  Q   Did he inspect all slopes of the roof?
3  A   Yes.
4  Q   And I assume on both the garage and the house?
5  A   Yes.
6  Q   Did you see him doing any -- did he do any chalk
7        marks on the roof?
8  A   Yes.
9  Q   Did you see him chalk off, like, a particular test
10       square and then --
11 A   Yes.
12 Q   All right.  And then did he assess the number of
13       hail hits with --
14 A   Yes.
15 Q   -- the test square?
16 A   And he explained to me -- I'm sorry.
17 Q   And then what did he explain to you?
18 A   He explained to me that a lot of times the hail
19       damage will be so many hits per square.
20 Q   Did he give you a particular number of hits per
21       square?
22 A   He said -- no.  Well, he didn't -- I'm sorry.  He
23       didn't say anything, just no.
24 Q   But he said he saw hail damage up there?
25 A   Yes.

---

Page 69

1  fins could be combed on the air conditioning unit?
2  A  Yes.
3  Q  What did he tell you?
4  A  He said that he had six combs inside of his truck,
5     and -- what's her name -- Pam could use any one
6     that she wanted to try to comb out them, that he
7     wouldn't do it because that he's run into problems
8     with it.  And the air conditioning unit was
9     damaged that it needed to be replaced.
10 Q  Do you know if he did any diagnostic analysis in
11    terms of the capacity of that air conditioning
12    unit?
13 A  No, other than his professional opinion as to what
14    needed to be done.
15 Q  To your knowledge, as far as Mr. Schrader's
16    inspection of the unit, was it just a visual
17    inspection?
18 A  I don't remember.
19 Q  Did you see him do any sort of testing on the
20    unit?
21 A  I don't remember.
22 Q  And you mentioned an interaction with -- I think
23    you said Pam earlier.  Are you talking about the
24    Travelers rep again?
25 A  Yes.

Page 70

1  Q  All right.  Ms. Parker?
2  A  Yes.
3  Q  What exactly was that conversation regarding the
4     combs that were out in Mr. Schrader's truck?
5  A  With Pam?
6  Q  I'm just trying to -- I'm not sure I understood
7     what the interaction there was.  Tell me about the
8     conversation.
9  A  She wasn't -- she was headstrong on not listening
10    to the professional people.  I questioned whether
11    she had a license or was trained in air
12    conditioning, which I didn't get an answer back,
13    so I assume that she hasn't been.  But she was
14    butting against professional people.
15       Now, I had another estimate done on air
16    conditioning because she wasn't happy with
17    Schrader's.  So I brought in somebody from
18    Platteville in order to write another estimate on
19    the air conditioner just to see if maybe it could
20    have been combed out.  But their diagnosis was the
21    same as Schrader's, that the whole unit needed to
22    be replaced.
23 Q  Okay.
24       MR. KNOKE: Her name is Katie,
25    Katie, Katie.

Page 71

1        THE WITNESS: I'm sorry.
2  Q  Katie Parker.
3  A  Okay.
4  Q  I may have referred to --
5  A  So when I say Pam, you know who I'm talking about.
6  Q  That will be her new nickname I guess.
7  A  There we go.
8  Q  If I do say Ms. McCombs too, it's because she also
9     went by McCombs.  I think she got --
10 A  Yes.
11 Q  She must have got married during the claim or
12    something.
13       At any rate, what I was actually -- what I
14    was getting at with my question is you had
15    referenced a specific conversation involving
16    Ms. Parker, Mr. Schrader, and I think you were
17    there during the inspection regarding an attempt
18    to comb it out?  Was there a specific --
19 A  I don't understand what you're --
20 Q  I may have misunderstood one of your answers.  Did
21    Ms. Parker ever ask Mr. Schrader to attempt to
22    comb the fins on the HVAC unit?
23 A  I have no idea.
24 Q  All right.
25 A  I had one more thing to say.  This isn't

Page 72

1  Mr. Schrader, but it was the second estimate that
2  I got, Ingersoll.  And Ingersoll Plumbing &
3  Heating told me that they had at one other time
4  combed out air conditioners, condensers, and they
5  got back six, six or eight air conditioners that
6  had blown up within a year.  And when they had to
7  replace them and when they went back to the
8  insurance company, the insurance company wouldn't
9  do anything about it.  So they had to eat all the
10 expense, and that's why he was so headstrong on
11 not combing.
12 Q  That's what Ingersoll told you?
13 A  Yes.
14 Q  Ultimately you did replace the air conditioning
15    unit, correct?
16 A  Yes.  The air conditioner did finally go out on
17    a --
18 Q  When did it go out?
19 A  -- hot day, and I had it replaced.
20 Q  When did it go out?
21 A  On a hot day.
22 Q  Do you recall whether it was the summer of 2017 or
23    2018?
24 A  You've got the bill there.  It would be on the
25    bill.

Larry Beer, et al. v.
The Travelers Home and Marine Insurance Company

Deposition of Larry E. Beer
January 28, 2020

---

**Page 77**

1    same.
2  Q  Would you consider yourself an expert in
3    determining whether an air conditioning unit can
4    be repaired or must be replaced?
5  A  Like I said, we did a lot of air conditioning work
6    in the body shop, and I was the one that made the
7    final decisions as to how it was going to be
8    fixed.
9  Q  So would you consider yourself to be an expert in
10    determining whether an air conditioning unit
11    similar to the one you have at your house needs to
12    be repaired or can be -- I'm sorry, needs to be
13    replaced or can be repaired?
14  A  I know the consequences that happen if it's not
15    fixed correctly.
16  Q  Okay.
17  A  And I also depended on the contractors to give me
18    more correct information.
19  Q  Do you have any knowledge as to the correlation
20    between a particular amount of damage to the fins
21    and the operating capacity of an air conditioning
22    unit?
23  A  No. That's partly why I asked for contractors to
24    guide me.
25  Q  Okay.

---

**Page 78**

1  A  In a car, yeah, I could tell you, but there's
2    different types of air movement around them.
3  Q  All right. Back to what we've marked as
4    Exhibit 8. This was -- actually, I want to ask
5    you about an e-mail that you wrote to
6    Bob Bellrichard --
7  A  Yes.
8  Q  -- midway down the first page. Who is
9    Bob Bellrichard?
10  A  I believe he's one of the representatives of
11    TRICOR.
12  Q  And TRICOR was your insurance agent?
13  A  Yes.
14  Q  Do you recall if you used Mr. Bellrichard to
15    obtain the Travelers policy?
16  A  As I told you earlier, I didn't obtain the policy.
17    My wife did.
18  Q  Ahh, yes. All right. You sent an e-mail to
19    Mr. Bellrichard on May 24, and it talks about the
20    response of the building inspector, correct?
21  A  Yes.
22  Q  All right. You had hired a building inspector at
23    some point to come take a look at the roof,
24    correct?
25  A  Yes.

---

**Page 79**

1  Q  And what was that gentleman's name? Warren,
2    right?
3  A  Warren Porter, I believe.
4  Q  How did you find Mr. Porter?
5  A  Very knowledgeable.
6  Q  Let me clarify my question. How did you decide to
7    hire Mr. Porter?
8  A  I was having problems with Travelers Insurance --
9  Q  Okay.
10  A  -- and the adjusters, so I -- and I was -- I
11    needed to know whether the contractors were
12    bluffing me or whether I was getting told a true
13    story. So I hired a building inspector to come
14    out, somebody that's -- what's the word -- that
15    has no interest on either side, and tell me what
16    their findings are.
17  Q  Had you used Mr. Porter ever before?
18  A  No.
19  Q  Okay.
20  A  I had no idea who he was.
21  Q  Did you learn of him by a referral from someone,
22    or did you find him online? Do you remember?
23  A  Probably online.
24  Q  Do you recall looking at his website?
25  A  No. We're talking, you know, close to three years

---

**Page 80**

1    ago.
2  Q  What was your understanding of Mr. Porter's
3    qualifications to assess hail damage on a roof?
4  A  He was more than qualified. He helped
5    Tommy Thompson set up on the licensing for
6    building inspectors. He also worked on the exam
7    that are given to people for their licensing. He
8    also taught classes. And believe it or not, one
9    of them is hail damaged shingles.
10  Q  Where did he teach classes; do you know?
11  A  I'm guessing it was in Madison, but we didn't have
12    that discussion. He might have gone to insurance
13    companies to explain. I've got no idea.
14  Q  Okay.
15        MR. KNOKE: Can you repeat the end
16    of the question -- or the answer. I'm sorry.
17        THE COURT REPORTER: "He might have
18    gone to insurance companies to explain. I've
19    got no idea."
20        Do you want me to go back farther?
21        "I'm guessing it was in Madison, but we
22    didn't have that discussion."
23  Q  There's a statement in here that you made to
24    Mr. Bellrichard, "When Warren was here he hinted
25    that Katherine [sic] take a class at the

---

Page 85

1 A  A block, yes.
2 Q  It looks like the next two photographs are a
3     little bit blurry of the outside of somebody's
4     house.  Do you know where these photographs are or
5     what's depicted in these photographs?
6 A  I don't know.  I don't remember that photograph.
7 Q  And then there's a photograph just looking out the
8     front lawn with what appears to be hail on the
9     lawn.  Do you recall where you got this
10    photograph?
11 A  I believe from a neighbor.
12 Q  Do you recall which neighbor?
13 A  No.  It seems like all the neighbors -- the
14    neighbors knew that I was having problems with
15    Travelers Insurance, so they came to me to get
16    evidence.
17 Q  All right.  Giving you photographs and stuff like
18    that?
19 A  Yes.
20 Q  About five pages from the end of this group of
21    photographs there's a photograph of some workers
22    working on a house.  Is that across the street
23    from you?  This one (indicating).
24 A  Yes.  And I believe that's Goodman Gutters.
25 Q  All right.

Page 86

1 A  Replacing gutters on a neighbor's house.  In fact,
2     he did quite a few of the homes in the area.
3 Q  Is this a photograph that you took?
4 A  Yes, or maybe my wife.  It's her cell phone.
5 Q  And then there's a photograph of --
6 A  Oh, yes.
7 Q  -- the gravel in your gutter?
8 A  Yes.
9 Q  And this --
10 A  Go back to this picture here (indicating).  You
11    can see where the neighbor right across the street
12    was getting a new roof.
13 Q  All right.
14 A  Plus the neighbor on the corner in the other house
15    you can see got a new roof too.  Both of them got
16    new siding.
17 Q  The next photograph, this is an example of the
18    gravel that you saw in your gutter, correct?
19 A  Can I see yours?  I don't know which one you're
20    at.
21 Q  Sorry.
22 A  That's in the gutters on the garage, yes.
23 Q  When was the last time you looked inside those
24    gutters prior to the storm?
25 A  Probably the last time they were cleaned out,

Page 87

1     which would have -- let's see.  This was in the
2     early spring, so it probably would have been fall,
3     unless the gutters were cleaned out in early
4     spring.
5 Q  Did you observe any similar gravel in the gutters
6     the previous fall?
7 A  No.
8 Q  Then the next photographs in here, we have
9     two images of shingles on the roof.
10 A  Okay.
11 Q  Do you have any idea who took those pictures?
12 A  No.
13 Q  Any idea what part of the roof is depicted in
14    these pictures?
15 A  No.
16 Q  And then the next two are pictures of the side of
17    your house, correct?
18 A  Can I see them?  Yes.
19 Q  That's the antenna that we see in the picture,
20    correct?
21 A  Yes.
22 Q  And that antenna leads down to I guess kind of a
23    little nook there on the side of the house,
24    correct?
25 A  Uh-huh, between two sunroofs -- sunrooms.  I'm

Page 88

1     sorry.
2 Q  We're looking at the east side of the house,
3     correct?
4 A  Yes.
5 Q  There's sort of a chipped, chipped paint here
6     (indicating) that's depicted in the fascia
7     there --
8 A  Yes.
9 Q  -- correct?
10 A  Yes.
11 Q  Do you know if that chip was there prior to the
12    storm?
13 A  Don't know.
14 Q  And this last photograph, do you know what this
15    is?
16 A  Yes.
17 Q  What is it?
18 A  That's the street in front of my house.  The pipe
19    that's there is the drain for the gutters.
20 Q  All right.  And that's gravel that we see?
21 A  Yes.
22 Q  Are you aware of any other photographs of the
23    damage other than the photographs in Exhibit 9
24    here?
25 A  No.

Larry Beer, et al. v.
The Travelers Home and Marine Insurance Company

Deposition of Larry E. Beer
January 28, 2020

Page 93

1  A  I don't right offhand.
2  Q  Okay.
3  A  But they're in the e-mails.  If you want to read
4     the e-mails, they're there.  Because when I follow
5     through with discussions, I put them on e-mails
6     and send them.
7  Q  Do you ever remember Ms. Parker using any language
8     that you thought was inappropriate?
9  A  No, I don't think.
10 Q  All right.  How about Mr. Conklin; do you recall
11    thinking that Mr. Conklin was negative?
12 A  Yes.
13 Q  What was your impression of Mr. Conklin?
14 A  When Mr. Conklin told Mr. Porter and the
15    Sherwin-Williams rep that they didn't know what
16    they were talking about, I thought that was pretty
17    unprofessional.
18 Q  What were Mr. Conklin's exact words to the
19    Sherwin-Williams rep?
20 A  These people don't know what they're talking
21    about.
22 Q  And he said that directly to them?
23 A  He said it while they were there and probably
24    directly to me.
25 Q  Okay.

Page 94

1  A  And my lawyer was there at the time, which wasn't
2     Mr. --
3  Q  Who was your lawyer at that time?
4  A  Ben Wood.
5  Q  Who was that?
6  A  Ben Wood.
7  Q  Oh, Ben Wood.
8  A  I wanted him on the site when we had the
9     reinspection.
10       THE WITNESS:  I'm sorry, Greg.
11 Q  Do you know what a public adjuster is?
12 A  Yeah.
13 Q  Did you ever hire a public adjuster in connection
14    with this insurance claim?  I haven't seen any
15    public adjuster contract.  I'm just --
16 A  No.  I hired an appraiser.
17 Q  Okay.
18 A  Which would be a public adjuster.  I mean, the
19    terms go kind of hand in hand.
20 Q  You're talking about Mr. Miller --
21 A  Yes.
22 Q  -- David Miller?  Okay.
23    And I know Mr. Miller serves as a public
24    adjuster in some instances.  Was it your intention
25    to hire Mr. Miller as an appraiser or as a public

Page 95

1     adjuster in this case?
2  A  An appraiser.
3  Q  All right.
4  A  To go along with the appraising clause in the
5     insurance company.
6  Q  Did you ever sign any contract with Mr. Miller
7     appointing him as a public adjuster?
8  A  Not a public adjuster but an appraiser.
9  Q  And then were there any other individuals who you
10    recall hiring as a public adjuster?
11 A  No, I don't recall anybody.
12    I would state again that whenever I had
13    estimates written, I assumed that these guys were
14    also adjusters.  They were there to inspect the
15    damage.  They were there to make a report on the
16    damage as to what they thought it was going to be
17    to repair them.  And that was for everybody, the
18    roof, the siding, the painting, the TV antenna.
19    All these guys were professional people, so I
20    would imagine that they are adjusters.  They're
21    finding out what it's going to take to repair,
22    what it's going to cost.
23 Q  You're talking about the Travelers adjusters?
24 A  No.  I'm talking about the estimates that I got in
25    order to give to Travelers Insurance to help them

Page 96

1     come up with an idea on what it was going to cost
2     to fix it.
3        Now, Travelers had the right to contact any
4     of these contractors and talk to them as far as
5     figuring out what the price is going to be or what
6     their ideas were, and Travelers contacted very few
7     of them I found out.
8  Q  All I'm trying to establish is whether you hired
9     any of those individuals as a public adjuster.
10 A  No.
11 Q  Okay.  Why don't we mark this as 11.
12       MR. KNOKE:  Off the record a
13    minute.
14    (Discussion off the record)
15    (Exhibit No. 11 marked for
16     identification)
17 Q  One question about Exhibit 11.  Is that a true and
18    correct copy of the estimate that you received
19    from Chamberlain Electric for the antenna?
20 A  Yes.
21 Q  You can set that one aside.
22    And Exhibit 10.  Do you recall receiving
23    Exhibit 10 from Travelers?  This would be the
24    June 29, 2017 estimate.
25       MR. KNOKE:  Let me catch up with

Larry Beer, et al. v.
The Travelers Home and Marine Insurance Company

Deposition of Larry E. Beer
January 28, 2020

Page 101

1   adjusters wouldn't let them use their ladder.
2   They had to get their own ladder. And I'm
3   thinking to myself Boy, is that petty.
4       Anyway, I told the two guys that were going
5   up to use the fire -- or the antenna. Climb up
6   the antenna. You can get on just as fast there.
7   I said As it stands, Travelers Insurance isn't
8   insuring me anyway.
9  Q   What specific conversations do you recall from the
10   second inspection? Did you speak with Mr. Conklin
11   and Ms. Parker yourself?
12  A   We all did. It was a discussion between
13   everybody. Those two, the insurance adjusters,
14   weren't interested in listening to anybody,
15   though.
16  Q   Why don't we do this: Why don't we break it down
17   by sort of property component here. What
18   conversations do you remember regarding the
19   repainting of the cedar shake siding?
20  A   They talked about the procedure, and both -- well,
21   all three. The Sherwin-Williams rep spoke, and
22   the painter, H&H Painting, put his information
23   out. And then Travelers Insurance adjusters said
24   a couple of -- didn't say much, but the thing I
25   remember most is when they said that These people

Page 102

1   don't know what they're talking about.
2  Q   So the Sherwin-Williams rep, was that
3   Mr. Culbertson?
4  A   Yes.
5  Q   All right. And I presume he recommended to
6   Travelers the same scope of repairs that he had
7   set forth --
8  A   Yes.
9  Q   -- in that report to you?
10  A   I don't know how it could change.
11  Q   Anything else you remember about Mr. Conklin's or
12   Ms. Parker's response?
13  A   They didn't agree with what these people were
14   saying.
15  Q   Do you recall whether they indicated why they
16   disagreed?
17  A   No.
18  Q   In your mind did you think there was room for an
19   honest disagreement about the siding?
20  A   No.
21  Q   Why not?
22  A   I just got done painting the house, and it was
23   dented. And I didn't know what the correct
24   procedure should be, but I had professional people
25   come and write estimates and make recommendations.

Page 103

1   These people do it for a living. I would like to
2   know if either of the adjusters ever painted a
3   house. You asked me earlier about doing roofs. I
4   wonder if they ever painted a house.
5  Q   Anything else that you remember about
6   conversations regarding siding during the second
7   inspection?
8  A   Just again H&H talked about being able to stain
9   and what the problems would be and painting, if I
10   would allow that to be done. And financially I
11   guess it was less expensive to do the painting,
12   and that was fine with me too.
13  Q   Any other conversations that you remember about
14   the repainting of the siding?
15  A   No.
16  Q   All right. What conversations do you remember
17   regarding damage on the roof during that second
18   inspection?
19  A   Again, Warren Porter mentioned his findings, and
20   they said that there may have -- at that point
21   they changed their ideas a little bit, that there
22   may have been a few shingles that were damaged up
23   there. Before they said that no shingles were, on
24   the very first estimate. And now we go down to a
25   few estimates.

Page 104

1       One thing was replacing the shingles around
2   the flashing, the chimney flashing. They said
3   they could do that by replacing just a couple of
4   shingles. So I know from the roofing that I've
5   done that that can't be done, that almost a square
6   would have to come off in order to just do around
7   the chimney.
8  Q   Why is that?
9  A   Because you have to pull back shingles in order to
10   get at the flashing that's underneath them.
11  Q   How would you describe the condition of the
12   shingles that were up there prior to the storm?
13  A   Excellent.
14  Q   Would you describe them as being brittle at all?
15  A   No.
16  Q   In other words, they were fairly pliable and
17   movable?
18  A   When we pulled the shingles off to send in to GAF,
19   they were very pliable.
20  Q   Who pulled the shingle off to send to GAF, you
21   or --
22  A   I had Star Builders do it. The bill is there.
23  Q   Did Star Builders removing the shingle to send to
24   GAF, did that cause any damage to surrounding
25   shingles; do you know?

Larry Beer, et al. v.
The Travelers Home and Marine Insurance Company

Deposition of Larry E. Beer
January 28, 2020

Page 109

1  Mr. Chamberlain, right?
2 A  No.
3 Q  And you don't know exactly what was said, right?
4 A  Right, other than what Mr. Chamberlain told me.
5 Q  All right. I'll show you what we'll mark as
6     Exhibit 13. Hold on one second.
7         (Exhibit No. 13 marked for
8         identification)
9         MR. KNOKE: What is it?
10        MR. DEVILLING: It's a June 28
11    e-mail. It begins "Is this going to be like
12    CCC giving an evaluation. . .?"
13 Q  Is Exhibit 13 a true and correct copy of an e-mail
14    that you sent to Ms. Parker?
15 A  Yeah, yes.
16 Q  What are you talking about here when you said "Is
17    this going to be like CCC giving an evaluation on
18    a vehicle?"
19 A  Insurance adjusters know what CCC is. And what it
20    is, it's a bought for and paid for by the
21    insurance company, an evaluation of a vehicle. So
22    if you're in an accident and they total your car,
23    CCC will write an evaluation on that car, which is
24    thousands -- which can be thousands of dollars
25    less than what the car is actually worth.

Page 110

1 Q  Is this something you've dealt with --
2 A  Yes.
3 Q  -- in your auto body repair shop?
4 A  Yes.
5 Q  Okay.
6 A  And I'm pretty sure that any insurance adjuster
7     would know what it's about.
8 Q  And you write in here "The last time an insurance
9     company brought in someone from a company that
10    evaluates for [an] insurance company I got taken
11    advantage of."
12        What were you referring to there?
13 A  Oh, I was -- I went down to Texas to work with a
14    humanity project, and I spent three weeks down
15    there helping a gentleman fix up his house to make
16    it livable in. And on the way back I was on
17    Highway 35, and some young gal ran into the back
18    of me doing 85 miles an hour, 80-some miles an
19    hour, okay? And I was driving one of my buddy's
20    Mitsubishi Eclipse convertible, anyway, which made
21    me responsible for getting his car repaired.
22        The insurance company came back and gave --
23    totaled the vehicle out and gave a value number of
24    the car through CCC of thousands of dollars less
25    than what he had just paid for that car six months

Page 111

1     before.
2 Q  Your e-mail to Ms. Parker was actually in response
3     to an e-mail she had sent you, correct, in
4     Exhibit 13?
5 A  Which is in there?
6 Q  Yes. Ms. Parker was --
7 A  Yes.
8 Q  Ms. Parker was notifying you that Travelers was
9     arranging for a company called HVACi to come to
10    your property, right?
11 A  Uh-huh.
12 Q  Is that a yes?
13        MR. KNOKE: You have to say yes or
14        no.
15 A  I'm sorry. Read the question again.
16 Q  Ms. Parker was notifying you that Travelers had
17    arranged for a company called HVACi to come to
18    your property, correct?
19 A  Yes, but it isn't very clear in this e-mail that
20    the letters are a particular business.
21 Q  Okay.
22 A  I believed that it stood for the usual heating,
23    ventilating, and air conditioning and --
24 Q  So had Ms. Parker explained to you who HVACi was?
25 A  No.

Page 112

1 Q  All right. Did you have any understanding as to
2     who HVACi was?
3 A  I knew that it was some heating, ventilating, and
4     air conditioning company.
5 Q  Your response -- you said in your first e-mail
6     "Understand I am not in favor of this." Were you
7     talking about Ms. Parker sending HVACi to your
8     property?
9 A  Okay. Some of the discussion over the phone was
10    that they were going to send it out, and I wanted
11    to know who they were, what the name was and who
12    they were so that I could check up on them.
13    Number one, I've already had two professional
14    contractors at the house, and I didn't want
15    somebody coming in being paid by an insurance
16    company to say that Look it, you can comb them
17    out.
18 Q  So when you said "Understand I am not in favor of
19    this" --
20 A  Right. So I wasn't in favor of them.
21 Q  You weren't in favor of HVACi coming to the
22    property; is that right?
23 A  Right.
24 Q  That's what you were referring to?
25 A  Yes.

Larry Beer, et al. v.
The Travelers Home and Marine Insurance Company

Deposition of Larry E. Beer
January 28, 2020

---

Page 117

1 Q   You don't recall any conversations other than
2     leaving messages on HVACi's --
3 A   I don't know.
4 Q   Okay.
5 A   Which he's one person, so he doesn't have an
6     office with a phone in it, other than an answering
7     machine, and he checks it rarely.
8 Q   Do you recall anyone from HVACi ever calling you
9     back?
10 A  I don't remember, no.
11 Q  Do you recall ever trying to contact HVACi's
12    employees at their personal phone numbers?
13 A  I found out cell phones, and I think it was
14    advertised as the regular number and then a cell
15    phone. It probably would have been, since he's a
16    one-man show, his personal cell phone.
17 Q  You recall getting that information through an
18    advertisement?
19 A  I'm pretty sure. I'd have to come up with it
20    somehow. And you know that cell phone numbers
21    are -- you can't get them unless it's advertised.
22 Q  In this e-mail you said, your last line in here,
23    as you said, "I still want to see your license so
24    please supply." Who were you directing that
25    toward, Ms. Parker?

---

Page 118

1 A   Yes, Katie.
2 Q   What license were you looking for her to supply?
3 A   All the license for heating, ventilating, and
4     air conditioning. They all have to be licensed to
5     deal with Freon. I was licensed to deal with
6     Freon. The recovery, you had to have certain
7     equipment, the knowledge, the ASE certification.
8 Q   Did you --
9 A   And she's making decisions which I didn't believe
10    that she was qualified.
11 Q  Did you think that she had a license, an HVAC
12    license?
13 A  I'm sure she didn't.
14 Q  You knew that she didn't?
15 A  I'm pretty sure. I didn't know that for sure, but
16    my guess was that she didn't.
17 Q  Why were you asking her to produce a license when
18    you --
19 A  Because I wanted to know whether she knew what she
20    was talking about.
21 Q  Did you ever do any investigation into HVACi to
22    determine if the person they were going to send
23    out had an appropriate license?
24 A  I would assume that if he was doing this as his
25    profession that he would. The State's pretty

---

Page 119

1     strict on that.
2 Q   Do you have any knowledge as to why HVACi
3     ultimately refused to come out to your property?
4 A   No idea.
5 Q   Would you agree with me that you sent multiple
6     e-mails to Ms. Parker demanding that she produce a
7     copy of her license?
8 A   Yes.
9 Q   Okay.
10 A  She was making decisions that affected me.
11        MR. KNOKE: Just answer the
12        question.
13 Q  You agree with me that you sent multiple e-mails
14    to Ms. Parker asking for a copy of her license,
15    correct?
16 A  Yes.
17 Q  We'll mark this as Exhibit 14.
18        (Exhibit No. 14 marked for
19        identification)
20        MR. KNOKE: What is it?
21        MR. DEVILLING: I'm sorry. A
22    June 29 at 12:42 p.m. e-mail that begins
23    "Deven Griffith."
24        MR. KNOKE: I've got it.
25 Q  Mr. Beer, I've handed you what we've marked as

---

Page 120

1     Exhibit 14. Is that a true and correct copy of an
2     e-mail that you sent to Ms. Parker?
3 A   Yes.
4 Q   Who's Deven Griffith?
5 A   I think he was a specialist for Travelers on
6     lining up people.
7 Q   And you requested that before Travelers send HVACi
8     out, again you were requesting to check their
9     license and qualifications, correct?
10 A  Right.
11 Q  And you reiterated that you wanted some kind of
12    warranty information and get local
13    recommendations, right?
14 A  Yes.
15 Q  Ms. Parker in her e-mail to you of June 29, 2017
16    references a phone call. She says "As I asked in
17    our phone call." Do you see that?
18 A  Yes, I see it.
19 Q  Do you recall that specific conversation with
20    Ms. Parker?
21 A  I don't recall it, but I'm sure it was.
22 Q  Do you agree that ultimately Travelers did include
23    the Chamberlain Electric estimate in its estimate
24    of damages?
25 A  I think they did on the last -- or the second or

---

Larry Beer, et al. v.
The Travelers Home and Marine Insurance Company

Deposition of Larry E. Beer
January 28, 2020

Page 125

1   problems he had before with combing and the
2   insurance company not being there afterwards.
3 Q   Oh, okay. I'm sorry. That was a conversation
4   with Ingersoll, not with the other contractor?
5 A   Well, it was with both contractors, but especially
6   with Ingersoll.
7 Q   What is the company Collision Specialists SSE,
8   Inc.? Do you know what that company is?
9 A   It's a body shop.
10 Q   And did you have Jeff Hagen out to your property
11   to provide an estimate?
12 A   Yes.
13 Q   And was that to repair the overhead doors?
14 A   The BILCO doors and the clothesline poles.
15 Q   All right.
16 A   And rear railings.
17 Q   And his estimate was $294.35; is that correct? We
18   can mark it as an exhibit. Why don't we just do
19   that.
20 A   I don't remember what his estimate was.
21           (Exhibit No. 18 marked for
22           identification)
23 A   Yes.
24 Q   I'll show you what we'll mark as Exhibit 19.
25

Page 126

1           (Exhibit No. 19 marked for
2           identification)
3 Q   Who is Connely & Sons, LLC?
4 A   A local contractor.
5 Q   Did you ever work with Connely & Sons before?
6 A   Pardon me?
7 Q   Had you ever used Connely & Sons before to do --
8 A   No.
9 Q   -- any work?
10       Connely & Sons gave you an estimate for total
11   replacement of the cedar shakes on the house and
12   the garage, correct?
13 A   No, on the south side and east side.
14 Q   All right. And then -- okay. So they gave you a
15   proposal for replacement of the sides that
16   experienced the hail damage, correct?
17 A   Yes.
18 Q   And did you ask them to give you an estimate for
19   removal and replacement of the cedar shake
20   shingles?
21 A   Yes.
22 Q   Did you ask them to give you any separate estimate
23   for just sanding and repainting?
24 A   No.
25 Q   Was there a reason that you asked them to give you

Page 127

1   an estimate for replacement of the cedar shakes?
2 A   What was that again?
3 Q   Was there a reason you asked them to give you an
4   estimate for replacement of the cedar shakes
5   rather than asking them to give you an estimate
6   for just sanding and repainting?
7 A   Yes.
8 Q   What was that reason?
9 A   Well, they're a contractor. They don't sand, and
10   they don't paint, so --
11 Q   Did anyone from Connely & Sons express any opinion
12   to you as to whether the cedar shakes could be
13   repaired as opposed to being totally replaced?
14 A   No. He seen that they were dented and damaged
15   from the hail.
16 Q   And who were you dealing with from Connely & Sons,
17   if you remember?
18 A   The owner I guess.
19 Q   Was it Mr. Connely?
20 A   Yes.
21 Q   All right. Did Mr. Connely tell you that it would
22   not have been possible to repair and repaint the
23   cedar shakes?
24 A   No, he didn't say that.
25 Q   He didn't say that. Okay. He just didn't express

Page 128

1   an opinion one way or another?
2 A   He doesn't do that kind of work.
3 Q   Understood. Who is Christopher Blotz?
4 A   A contractor.
5 Q   All right. And what did you have Mr. Blotz
6   estimate for you?
7 A   I believe it was the garage door, walk-through
8   door.
9 Q   I'm handing you what we'll mark as Exhibit 20.
10           (Exhibit No. 20 marked for
11           identification)
12 Q   So the garage door that's referenced on the first
13   page of Exhibit 20, is that a different door than
14   the overhead doors we were discussing earlier?
15 A   Correct.
16 Q   All right. And what was the damage to this garage
17   door?
18 A   It was dented from the hail.
19 Q   Did you personally observe dents in the garage
20   door?
21 A   Yes.
22 Q   So Mr. Blotz's estimate for replacing the garage
23   door -- I'm sorry. Was he estimating replacement
24   or just fixing it?
25 A   Replacement.

Larry Beer, et al. v.
The Travelers Home and Marine Insurance Company

Deposition of Larry E. Beer
January 28, 2020

---

Page 133

1 Q   All right.  And I've got an invoice for a trip out
2       there.  It's dated -- the invoice is dated
3       October 6, 2017.  Do you recall if that's the date
4       that they came out to the property?
5 A   Don't remember.
6 Q   All right.  Ultimately Dubuque Glass Company is
7       the one that did the work for the door, correct?
8 A   They wrote the estimate on it.
9 Q   Did they do the work?
10 A   No.
11 Q   Did Travelers include the Dubuque estimate in the
12       Travelers estimate?
13 A   Pardon me?
14 Q   Travelers ultimately included the Dubuque Glass
15       estimate within Travelers' estimate of damages?
16 A   Some of it.
17 Q   What part of it, to your understanding, is still
18       disputed?
19 A   I don't remember for sure except that I don't
20       think they included the estimate charges.
21 Q   Oh, the trip charge for the estimate?
22 A   Yes.
23 Q   I'm going to show you what we'll mark as
24       Exhibit 23.
25

---

Page 134

1           (Exhibit No. 23 marked for
2             identification)
3 Q   Is this a copy of an e-mail that you sent to
4       Kathryn Parker, Kim Burnell, Ryan Conklin, and
5       others on October 30, 2017?
6 A   I don't know.  I've got to read it.
7 Q   Sure.
8           (Witness reviews document)
9 A   Yes.
10 Q   Dave Fritz is a name that's mentioned in the
11       e-mail.  Who is Dave Fritz?
12 A   Dave Fritz is the owner of TRICOR Insurance.  They
13       have quite a few locations.
14 Q   And did Dave Fritz tell you at some point that you
15       were not to contact TRICOR's office?
16 A   Yes, he did.
17 Q   Tell me what you recall about that conversation or
18       communication.
19 A   I reminded him that he advertises taking care of
20       his clients' claims, which he didn't do.
21 Q   Was there any particular dispute or particular
22       communication that led to his request that you
23       stop contacting TRICOR?
24 A   No, but I assume that the insurance company told
25       him to stay out, that they would handle it.

---

Page 135

1 Q   All right.  Do you have any specific information
2       that Travelers instructed TRICOR to tell you to
3       stop contacting TRICOR?
4 A   I don't know.
5 Q   In the second sentence here it says that
6       Kathryn Parker was, in your words, very rude.  Do
7       you see that?
8 A   Yep.
9 Q   Do you recall --
10 A   Yes.
11 Q   -- specifically what she said that you found --
12 A   I don't.
13 Q   -- her being rude?  Okay.  That's all I have about
14       Exhibit 23.
15           I'm going to hand you what we'll mark as
16       Exhibit 24.
17             MR. DEVILLING:  Greg, this is the
18       Travelers November 1, 2017 estimate.
19           (Exhibit No. 24 marked for
20             identification)
21 A   Is that the second or third estimate?
22             MR. KNOKE:  Well, hand it over so I
23       can find out what's being discussed.
24 Q   Actually, I might be able to ask you some
25       questions without even specifically referencing

---

Page 136

1 this Exhibit 24 here.
2           Over the course of the claim did you receive
3       three different estimates from Travelers?
4 A   I did.
5 Q   All right.  Is it your understanding that
6       Travelers' November 1, 2017 estimate was
7       Travelers' final estimate that they shared with
8       you?
9 A   What was the amount on there?
10 Q   Replacement cost value of $10,397.52.
11 A   Actual cash value.
12 Q   Actual cash value, $9,485.24.
13 A   Yes, that was the third one.
14 Q   So it was your understanding that the November 1,
15       2017 estimate marked as Exhibit 24 was the last
16       one Travelers sent you; is that correct?
17 A   Yes.
18 Q   That's all I have about Exhibit 24.
19             MR. DEVILLING:  About four pages
20       after that, Greg, Ingersoll.
21           (Exhibit No. 25 marked for
22             identification)
23           (Discussion off the record)
24 Q   I've handed you what I've marked as Exhibit 25.
25       Is this a true and correct copy of

---

Larry Beer, et al. v.                                              Deposition of Larry E. Beer
The Travelers Home and Marine Insurance Company                          January 28, 2020

Page 141

1          (Witness reviews document)
2  A   What was your question again?
3  Q   Did you receive the letter that we've marked as
4      Exhibit 28?
5  A   Yes.
6  Q   And this letter quotes the policy appraisal
7      provision.  Do you see that?
8  A   Yes.
9  Q   And then it lists 14 different areas of dispute,
10     correct?
11 A   Yes.
12 Q   All right.  And what I'm going to ask you about
13     each of these categories is whether it's an
14     accurate summary of the dispute, okay?
15         So we start with the air conditioner,
16     Category 1.  It says "You have submitted an
17     invoice from Ingersoll Plumbing and Heating for
18     the complete replacement of the air conditioning
19     unit for $2,503.75."
20         That's a correct statement, right?
21 A   Yes.
22 Q   Travelers' position was that the fins of the air
23     conditioning unit could be combed, correct?
24 A   Correct.
25 Q   Is paragraph 1 an accurate summary of the dispute?

Page 142

1  A   Yes.
2  Q   Paragraph 2, the roofs, it references your TruHome
3      estimate for $23,000, correct?
4  A   Yes.
5  Q   And it says "Travelers found no hail damage to the
6      shingles on the home."  "There was hail damage on
7      the home's chimney flashing."  It says "There were
8      two shingles on the garage roof that showed hail
9      damage as well as one furnace cap.  Travelers
10     estimated that the cost to repair the two damaged
11     shingles, and to replace the chimney flashing and
12     the furnace cap is $733.56."
13         Do you see where it says that?
14 A   Yes.
15 Q   All right.  Is that an accurate summary of the
16     nature of the dispute?
17 A   No.
18 Q   What's inaccurate?
19 A   The number of shingles that they said were
20     damaged.
21 Q   Okay.
22 A   And if you go back through the records, you'll
23     find how many that they said at a different time.
24     First they said there were none.  Now in this one
25     here they say there's just a couple.

Page 143

1  Q   Okay.
2  A   Then it was shingles here and there all over the
3      roof that needed to be replaced.
4  Q   All right.  When did Travelers ever tell you that
5      there were shingles all over the roof that needed
6      to be replaced?
7  A   When they gave the number of shingles over the two
8      that they mentioned here.
9  Q   And when was that?
10 A   I've got no idea.
11 Q   You agree that there was a dispute, though, as to
12     the number of shingles that had hail damage on the
13     roof?
14 A   Yes.
15 Q   All right.  And you agree that there is a dispute
16     as to whether certain damage up on the roof was
17     caused by hail?
18 A   What was that again?
19 Q   Do you agree that there was a dispute as to
20     whether certain damage on the roof was caused by
21     hail?
22 A   Well, we were looking for damage that was caused
23     by the hail, so the damage would have been caused
24     by hail.
25 Q   Then is it true that the nature of the dispute

Page 144

1      regarding gutters was how many linear feet of the
2      gutters needed to be replaced?
3  A   Yes.
4  Q   And Category 4 references the TV antenna, correct?
5  A   Yes.
6  Q   And Travelers had not disputed the
7      Chamberlain Electric estimate for the actual
8      repairs, correct?
9  A   Yes.
10 Q   I'm sorry.  Yes, that's correct?
11 A   Except for the argument back and forth with
12     Chamberlain.  Chamberlain didn't want to do the
13     repairs anymore.  Then I had a problem.
14 Q   But, I mean, by the date of this letter here,
15     April 9, 2018, Chamberlain had completed the
16     repair work?
17 A   After I went through a bunch of work in order to
18     get it back on the road again.
19 Q   It looks like the only dispute is whether
20     Travelers was obligated to cover the RadioShack
21     trip charge, correct?
22 A   Right.
23 Q   On the storm doors it says -- well, is it true
24     that by April 9, 2018 there was no longer any
25     dispute as to coverage for the storm doors?

Larry Beer, et al. v.
The Travelers Home and Marine Insurance Company

Deposition of Larry E. Beer
January 28, 2020

---

Page 149

1    that?
2  A  Yes.
3  Q  Have you ever seen any document in which Travelers
4    designated Herb Virella as its appraiser?
5  A  Yes.
6  Q  What document is that?
7  A  I believe.  I would have to check my notes on
8    that.
9  Q  Do you remember what specific document that was?
10 A  I don't.
11 Q  Okay.
12 A  But I remember that I knew the name of who was
13   going to come and appraise.
14 Q  All right.
15 A  So they must have.
16 Q  At any rate, you agree with me that this letter
17   marked as Exhibit 28 does not designate
18   Mr. Virella but designates Mr. Koertge, correct?
19 A  Restate that.
20 Q  Sure.  This letter designates Eric Koertge as
21   Travelers' appraiser, correct?
22 A  Right.
23 Q  This letter does not reference Herb Virella,
24   correct?
25 A  Right, but I did get --

---

Page 150

1        MR. KNOKE:  Wait.  That's correct.
2  Q  On page 6, the final page of this letter, it says
3    "Please notify us within twenty (20) days from the
4    date of this letter whether you accept the terms
5    of the appraisal as outlined above."
6      Do you see that?
7  A  Yes.
8  Q  Did you notify Travelers within 20 days as to
9    whether you accepted the terms of the appraisal?
10 A  I didn't.
11 Q  Did not?
12 A  Because the appraisal was already set up.
13 Q  Just so we're clear, you said you did not?
14 A  I did not.
15 Q  Okay.
16 A  I answered them with my appraiser.
17 Q  All right.  So then what was your understanding
18   was the status of the appraisal after you received
19   this April 9, 2018 letter?  Is it your
20   understanding that it was ongoing through the
21   start?
22 A  Uh-huh.
23 Q  Is that a yes?
24 A  Yes.
25 Q  Did you have conversations with Mr. Miller about

---

Page 151

1    this letter that you received from Travelers on
2    April 9, 2018?
3  A  I don't remember.
4  Q  What was your next contact with Mr. Miller?
5  A  Probably when he came to the house to appraise.
6    Setting an appointment up I guess.
7  Q  And did Mr. Miller ask you to provide any
8    claim-related documents that you received during
9    the insurance claim?
10 A  No.
11 Q  Do you know what information Mr. Miller was
12   provided prior to the appraisal?
13 A  I don't think any because his job was to come out
14   and appraise the hail damage along with Travelers'
15   appraiser.
16 Q  At any point did you provide your thoughts to
17   Mr. Miller as to what you thought was hail
18   damaged?
19 A  We walked around the house, and I showed him where
20   the hail damage was, where I thought it was.
21 Q  And that was prior to the appraisal?
22 A  Yes.
23 Q  That would have been on Mr. Miller's first visit
24   out to the property?
25 A  Yes.

---

Page 152

1  Q  Do you know if you put Mr. Miller in touch with --
2    let me strike that.
3      Do you recall putting Mr. Miller in touch
4    with any of the contractors that already had gone
5    out and looked at the property?
6  A  No.
7  Q  Did you meet Mr. Virella when he came out to the
8    property?
9  A  Yes.
10 Q  So you had your first meeting with Mr. Miller,
11   which would have been sometime shortly before
12   March 20, correct?
13 A  Right.
14 Q  And then the next time Mr. Miller came out to the
15   property was when he met Mr. Virella out there,
16   correct?
17 A  Right.
18 Q  And that was not -- do you remember what date that
19   was?
20 A  No.
21 Q  Do you remember whether it was later in the
22   summer, middle of the summer, fall?
23 A  They had problems getting together on a date, and
24   they had to change it.
25 Q  Okay.

---

Page 157

1  A   What's the date on it?
2  Q   September 10, 2018.  Actually, I think I can ask
3       these questions without even getting into the
4       report itself.
5          The Benchmark Hail History Report shows hail
6       of .75 inches at the property address on certain
7       dates throughout 2017 and 2018.  My question to
8       you --
9          MR. KNOKE:  For the record, I don't
10      think that Larry has a copy of that.
11         MR. DEVILLING:  Okay.
12         MR. KNOKE:  It was part of the
13      discovery response.
14         MR. DEVILLING:  Right.
15         MR. KNOKE:  And I know that he's
16      been given the whole pile, but I don't think
17      he's --
18         MR. KIND:  He's given everything to
19      us, and I don't recall seeing that in
20      anything he ever gave us.
21         MR. DEVILLING:  That's fine.  I'm
22      going to ask you then just about a few
23      specific dates.
24         MR. KNOKE:  Is this an exhibit now,
25      Brian?

Page 158

1          MR. DEVILLING:  I don't care if we
2       mark it or not.  Do you want to mark it?
3          MR. KNOKE:  I suppose we ought to
4       if we're talking about it.
5          MR. DEVILLING:  That's fine.
6          MR. KNOKE:  Exhibit 30?
7          MR. DEVILLING:  Yes.
8       (Exhibit No. 30 marked for
9          identification)
10 Q   Mr. Beer, have you seen this document before?
11 A   No.
12 Q   All right.  There are a few dates referenced in
13     here.  First, do you see March 7 -- I'm sorry,
14     March 23, 2017?
15 A   Yes.
16 Q   Where it says one inch of hail at property
17     address?
18 A   Yes.
19 Q   And then moving up from there, do you have any
20     recollection of whether you were at the property
21     on May 15, 2017?
22 A   No.
23 Q   Do you have a recollection of whether you were at
24     the property on June 28, 2017?
25 A   No.

Page 159

1  Q   How about July 12, 2017; do you remember if you
2       were at the property or not?
3  A   July what?
4  Q   July 12, 2017.
5  A   July 12, '17.  No.
6  Q   Do you remember if you were at the property on
7       July 19, 2017?
8  A   I don't know.
9  Q   Do you remember if you were at the property on
10      May 2, 2018?
11 A   I don't know.
12 Q   Do you remember if you were at the property on
13      June 9, 2018?
14 A   It looks to me on this that there's only two hail
15      sizes.
16         MR. KNOKE:  Just answer the
17      question.
18 Q   So back to my question.  Do you remember if you
19      were at the property on June 9, 2018?
20 A   No.
21 Q   How about August 1, 2018?
22 A   No.
23 Q   Do you know for certain one way or another as to
24      whether you were at the property on any of those
25      dates?

Page 160

1  A   No.
2          MR. KNOKE:  I'm going to object for
3       the record.  This is the first time he's seen
4       this, and it's not a very fair question not
5       having an opportunity to reflect on
6       calendars, work orders, and other items.
7          MR. DEVILLING:  I'm just asking him
8       if he remembers whether he was there.
9  A   What was the name on that?
10 Q   All right.  Who is Mitch Tollefson?
11 A   A neighbor.
12 Q   Was Mitch Tollefson ever your attorney?
13 A   No.
14 Q   Is he an attorney?
15 A   No.
16 Q   Have you reviewed certain affidavits that were
17      provided along with photographs of hail from
18      Mitch Tollefson?
19 A   Yes.
20 Q   Any idea beyond Mr. Tollefson having an asphalt
21      roof, any idea what kind of roof he had?
22 A   No idea.
23 Q   Any idea what kind of shingles he had?
24 A   No idea.
25 Q   Any idea what the hail resistance of his shingles

Larry Beer, et al. v.
The Travelers Home and Marine Insurance Company

Deposition of Larry E. Beer
January 28, 2020

Page 165

```
 1   STATE OF WISCONSIN )
                        ) ss.
 2   COUNTY OF DANE     )

 3

 4        I, Carmen Harder, RPR, a Notary Public in and

 5   for the State of Wisconsin, do hereby certify that

 6   the foregoing deposition of LARRY E. BEER was taken

 7   before me on January 28, 2020, and reduced to writing

 8   by me, a professional court reporter and

 9   disinterested person, approved by all parties in

10   interest and thereafter converted to typewriting

11   using computer-aided transcription.

12        I further certify that I am not related to nor

13   an employee of counsel or any of the parties to the

14   action, nor am I in any way financially interested in

15   the outcome of this case.

16        IN WITNESS WHEREOF, I have hereunto set my hand

17   and affixed my notarial seal of office at Madison,

18   Wisconsin, this 7th day of January 2020.

19

20

21                    _____
                      Notary Public, State of Wisconsin
22                    My Commission Expires 9/25/2021

23

24

25
```

Larry Beer, et al. v.
The Travelers Home and Marine Insurance Company

Deposition of Larry E. Beer
January 28, 2020

automotive (1)
  41:8
Avoca (4)
  115:10,13,15,19
aware (5)
  27:5;67:7;76:16;
  88:22;105:10
away (5)
  51:9;84:23;89:7;
  90:17;98:9

**B**

bachelor's (2)
  7:18,20
back (43)
  12:22;15:11;21:16,
  18,22;24:23;25:1,9,25;
  26:19;31:14;32:2,7,15;
  35:23;41:14;52:21;
  53:1;57:24;67:17;
  70:12;72:5,7;74:15;
  75:11;78:3;80:20;
  86:10;90:6;92:15;98:1;
  104:9;106:22;110:16,
  17,22;117:9;122:1;
  142:22;144:11,18;
  153:4;159:18
backed (1)
  114:18
background (9)
  6:13;8:23;9:23;10:3,
  9;68:6;76:9,10,12
bad (1)
  116:12
bank (1)
  27:14
bare (1)
  57:19
based (4)
  46:19,20;132:1;
  163:9
basically (1)
  123:18
basis (1)
  61:9
bathroom (1)
  6:24
beautiful (1)
  14:19
bedroom (2)
  66:7,25
BEER (12)
  6:1,7;7:13;10:14,16;
  13:10;52:16;57:2;
  119:25;122:1;148:20;
  158:10
Beers (1)
  60:25
begins (3)
  108:10;109:11;
  119:22
belief (1)

38:4
Bellrichard (5)
  78:6,9,14,19;80:24
Ben (5)
  94:4,6,7;99:6,7
Benchmark (2)
  156:25;157:5
besides (1)
  113:20
best (1)
  44:14
better (2)
  37:4;51:18
Beyond (1)
  37:11;123:2;160:20
bids (1)
  45:17
big (1)
  31:23
bigger (1)
  35:9
BILCO (5)
  33:3;125:14;147:12,
  14,22
bill (5)
  49:3;72:24,25;99:5;
  104:22
bills (2)
  137:23;162:18
bit (7)
  8:20;35:9;44:11;
  75:12;85:3;98:23;
  103:21
block (6)
  26:11,16,18;84:24,
  25;85:1
Bloom (4)
  84:21,23;161:6,6
Bloom's (2)
  84:20;161:24
Blotz (8)
  128:3,5;129:12,16,
  21;130:2;131:24;
  132:11
Blotz's (1)
  128:22
blown (1)
  72:6
bluffing (1)
  79:12
blurry (1)
  85:3
Bob (2)
  78:6,9
body (4)
  8:15;77:6;110:3;
  125:9
boss (2)
  81:14;99:3
both (14)
  7:4;13:22;26:16;
  31:10;33:19;34:8;64:4;
  68:3;86:15;92:2,22;

100:16;101:20;125:5
bottom (1)
  56:24
bought (4)
  12:14;13:5;42:22;
  109:20
Boy (1)
  101:3
boys (1)
  16:19
break (6)
  6:21;7:1;75:8,10;
  101:16;121:20
breakdown (1)
  132:18
Brian (10)
  6:7;10:20;58:4,6;
  60:4;97:1;99:4;131:6;
  148:16;157:25
bricks (1)
  17:2
brittle (1)
  104:14
broad (2)
  28:12,14
brought (3)
  39:15;70:17;110:9
bruise (1)
  24:20
bruised (1)
  24:18
bruising (3)
  23:14;35:25;36:19
buddy's (1)
  110:19
build (1)
  13:8
Builders (6)
  12:7,8,11;24:9;
  104:22,23
building (8)
  23:16,24;33:6;36:22;
  78:20,22;79:13;80:6
buildings (3)
  33:7;41:17;74:7
built (3)
  10:11;13:16;74:25
bunch (1)
  144:17
bundles (2)
  63:11,11
Burnell (9)
  131:3,11,15,20,25;
  132:14;134:4;137:15,
  19
business (14)
  8:13,14,9:7;12:8;
  37:22;47:9;48:21;73:5;
  74:20;76:13;91:1,8;
  111:20;116:7
busy (5)
  25:8;107:23;116:3,4,
  4

butting (1)
  70:14

**C**

cable (1)
  89:7
calendars (1)
  160:6
call (7)
  12:18;25:2,4;48:2;
  120:16,17;124:6
called (18)
  6:1;21:5,8;25:7;
  41:11;47:5;51:3,9,10;
  62:6;74:8;108:22;
  111:9,17;116:8,9,19;
  124:8
calling (2)
  115:17;117:8
calls (2)
  116:19;140:2
calmed (1)
  48:20
came (28)
  24:9;29:19;48:14;
  52:24;60:9,12;62:18;
  63:10,13;66:6;74:8;
  81:13,14,19;84:7;
  85:15;98:21;99:19;
  105:23;106:2;110:22;
  122:22;133:4;139:21;
  151:5;152:7,14;153:12
can (39)
  6:17;7:1;11:15;16:2;
  24:20;27:1;38:3,23;
  39:12;41:15;45:8;47:2;
  73:25;76:2;77:3,12,13;
  80:15;86:11,15,19;
  87:18;89:18;90:21,23;
  96:21;101:6;105:1;
  109:24;112:16;114:7,
  13;125:18;135:23;
  138:25;139:4;140:23;
  155:21;157:2
cap (3)
  142:9,12;148:13
capable (1)
  140:3
capacity (2)
  69:11;77:21
car (8)
  76:23;78:1;109:22,
  23,25;110:21,24,25
care (14)
  19:23;20:14;24:14;
  28:3;40:6,8;60:20;
  107:6;116:7;121:16;
  129:14;134:19;155:13;
  158:1
carrier (1)
  22:15
case (5)

6:8;74:24;92:8;95:1;
  139:12
cash (3)
  97:21;136:11,12
catch (2)
  26:12;96:25
categories (3)
  141:13;147:20;148:4
Category (3)
  141:16;144:4;146:10
caught (1)
  155:6
caulked (2)
  55:14,19
cause (5)
  36:3,17;104:24;
  105:2,7
caused (10)
  16:12;19:18;20:9;
  25:14;98:3;143:17,20,
  22,23;145:20
CCC (5)
  109:12,17,19,23;
  110:24
cedar (22)
  13:6,19;40:17,24;
  42:25;43:9;50:22;
  53:14;54:16,19,20;
  55:13;56:20;101:19;
  126:11,19;127:1,4,12,
  23;146:12,13
ceilings (1)
  66:8
cell (5)
  86:4;117:13,14,16,
  20
center (2)
  98:6;105:2
Certain (12)
  14:2,3;52:22;89:23,
  24;118:6;143:16,20;
  148:4;157:6;159:23;
  160:16
Certainly (1)
  44:18
certification (1)
  118:7
chalk (6)
  23:13;24:1,4;64:6,9;
  82:19
Chamberlain (27)
  45:24;46:1,2;47:5,7,
  8,11;48:1,7,20;89:2;
  96:19;108:10,15,17,21;
  109:1,4;120:23;130:9,
  14;131:16,22;144:7,12,
  12,15
Chamberlain's (1)
  48:16
chance (2)
  66:25;67:6
change (3)
  102:10;138:18;

8,19;25:14,21,24;26:7,
8;31:9,16,21;32:17;
33:1.5.15,22,23;34:1.5,
11,14;36:3,17,19,25;
37:4;40:12,15;43:3,14,
18,20;44:18;45:6,19;
46:15,15,19;53:16;
57:7;60:25;61:3,7;
64:19,24;65:2;66:24;
73:25;75:18;76:3;
77:20;80:3;81:3,5;
88:23;89:21;95:15,16;
98:3;103:17;104:24;
105:2,7,10,16,19,21,
25;106:17,20,23;
107:8;126:16;128:16;
132:1;142:5,6,9;
143:12,16,20,22,23;
145:20;148:4;151:14,
20;153:10;161:23
**damaged (20)**
19:20;21:10;32:1,20,
23;46:8;55:11;66:16;
69:9;80:9;81:1;98:16;
103:22;127:14;142:10,
20;151:18;162:21,25;
163:7
**damages (2)**
120:24;133:15
**date (16)**
15:12,16,23;20:17;
29:3;30:8;53:7;133:3;
139:24;144:14;150:4;
152:18,23;153:3;
156:13;157:1
**dated (6)**
60:7;124:2;130:16;
133:2,2;156:8
**dates (5)**
29:12;157:7,23;
158:12;159:25
**Dave (4)**
134:10,11,12,14
**David (3)**
94:22;138:4;139:14
**day (5)**
21:3;34:20;72:19,21;
99:16
**days (4)**
21:20;107:6;150:3,8
**deal (3)**
48:8;118:5,5
**dealing (3)**
52:12;124:12;127:16
**dealt (3)**
46:1;68:9;110:1
**decide (1)**
79:6
**decided (1)**
113:25
**decisions (5)**
51:20;53:3;77:7;
118:9;119:10

**defer (1)**
139:3
**definitely (2)**
32:17;81:3
**degree (2)**
7:23;8:17
**delay (1)**
30:5
**demand (6)**
138:18,19;139:7,12,
18,20
**demanded (1)**
138:21
**demanding (2)**
119:6;138:14
**Dented (4)**
49:23;102:23;
127:14;128:18
**dents (17)**
31:18,18,19;40:17,
19,22;42:25;43:8,9,11;
46:16;49:25;53:16;
57:20;74:4;128:19;
129:15
**depend (1)**
36:10
**depended (1)**
77:17
**depicted (5)**
84:19;85:5;87:13;
88:6;161:16
**depicting (1)**
35:6
**deposition (2)**
6:9;59:25
**depreciation (2)**
97:12,16
**describe (6)**
24:16;45:8;73:25;
104:11,14;146:18
**designate (1)**
149:17
**designated (2)**
148:23;149:4
**designates (2)**
149:18,20
**destroying (1)**
50:10
**detailed (1)**
132:18
**details (1)**
161:20
**deteriorate (1)**
105:8
**deteriorated (1)**
14:6
**deterioration (2)**
50:9;153:14
**determination (1)**
46:10
**determine (2)**
66:12;118:22
**determining (3)**

11:14;77:3,10
**Deven (2)**
119:23;120:4
**Devilling (28)**
6:6,7;39:14;52:1;
59:24;75:7;83:18;
109:10;119:21;121:21;
130:4;131:7;135:17;
136:19;137:10;139:5;
148:17;155:18,21;
157:11,14,21;158:1,5,
7;160:7;162:6;164:8
**diabetic (1)**
138:1
**diagnosis (1)**
70:20
**diagnostic (2)**
69:10;123:22
**diameter (1)**
35:13
**differ (1)**
53:22
**difference (4)**
50:18;54:1;73:12;
138:23
**differences (2)**
42:9;139:1
**different (14)**
23:11,25;36:21;37:3;
40:4;41:12;43:23;
76:24;78:2;106:8;
128:13;136:3;141:9;
142:23
**differently (1)**
97:14
**difficult (1)**
54:13
**direct (2)**
132:1;154:22
**directing (1)**
117:24
**direction (1)**
33:13
**directly (3)**
93:22,24;155:11
**disagree (2)**
29:13;89:19
**disagreed (1)**
102:16
**disagreement (1)**
102:19
**discovery (2)**
83:7;157:13
**discuss (1)**
68:25
**discussed (2)**
54:24;135:23
**discussing (1)**
128:14
**Discussion (20)**
12:16;22:23;30:24;
34:24;40:19;52:3;
57:15,16;61:6,11;

62:21;75:6;80:12,22;
96:14;101:12;112:9;
123:14;131:9;136:23
**discussions (5)**
36:13;65:8;93:5;
124:10,20
**dispute (30)**
29:2;44:17,18;45:1,
5,8,9,18;134:21;141:9,
14,25;142:16;143:11,
15,19,25;144:19,25;
145:4,13,19,23;146:2,
3,7,12,19;147:9,13
**disputed (2)**
133:18;144:6
**disrupting (1)**
105:6
**doctors (1)**
137:24
**document (13)**
55:20;130:9,17;
134:8;141:1;149:3,6,9;
158:10;162:6,11,15,17
**documentation (1)**
53:1
**documents (2)**
59:9;151:8
**Dodgeville (3)**
73:14,20;74:18
**dollars (2)**
109:24;110:24
**done (33)**
7:4;10:25;11:2,22;
12:14,21;14:9;25:21;
36:1;42:11;47:7;48:21;
51:12,20;62:24;66:11;
69:14;70:15;90:19;
92:6;98:9;99:24;
102:22;103:10;104:5,
5;105:3,5,21,25;
107:13;114:18;162:2
**door (13)**
74:15,22;106:2;
128:7,8,12,13,17,20,
23;132:8;133:7;145:23
**doors (37)**
31:19;33:3;45:6;
73:14,20,21,22;74:1,5,
8,11,12,14,16,18,21,21.
23,25;90:4;105:19,21,
25;106:13;125:13,14;
128:14;132:24;144:23,
25;145:18,20;147:12,
14,22,22;148:11
**dotted (1)**
83:1
**dowel (1)**
98:10
**down (12)**
24:14;26:4;42:10;
48:20;57:21;78:8;
87:22;101:16;103:24;
110:13,14;121:10

**draft (1)**
140:12,15
**drafted (1)**
140:13
**drafting (1)**
8:19
**drain (1)**
88:19
**drained (1)**
76:2
**drink (1)**
6:25
**driving (1)**
110:19
**drug (1)**
60:22
**du (2)**
44:2;61:22
**Dubuque (14)**
27:21,22;74:22,23;
90:5,12,14,14,16;91:1;
132:22;133:6,11,14
**due (2)**
46:8;57:9
**duly (1)**
6:2
**Dunnellon (1)**
20:24
**Duration (1)**
53:19
**during (24)**
11:24;16:5;29:24;
30:17;38:6,19;43:18;
48:2;49:17;51:16;
59:17;67:8;71:11,17;
82:5;91:14;103:6,17;
106:15;107:9;151:8;
153:8,16,23
**duties (1)**
92:9

**E**

**earlier (12)**
31:13;54:5;61:24;
69:23;76:9;78:16;91:9;
103:3;124:25;128:14;
129:8;161:17
**early (3)**
29:24;87:2,3
**easier (1)**
6:18
**east (9)**
31:9;33:9,10;43:5,6;
61:3;88:2;126:13;
148:25
**eat (1)**
72:9
**Eclipse (1)**
110:20
**edge (2)**
36:20;114:21
**education (2)**

Larry Beer, et al. v.
The Travelers Home and Marine Insurance Company

Deposition of Larry E. Beer
January 28, 2020

followed (1)
132:11
following (1)
27:6
follows (2)
6:3;97:5
foolish (1)
113:15
foot (1)
11:4
forensic (1)
11:11
forth (3)
92:16;102:7;144:11
found (12)
24:2;32:5;96:7;
97:24;113:12,17;
115:8,12,14;117:13;
135:11;142:5
four (3)
15:18;63:11;136:19
frame (1)
153:8
Freon (3)
76:25;118:5,6
frequently (1)
14:17
friend (1)
116:10
friends (1)
116:9
Fritz (4)
134:10,11,12,14
front (11)
40:16;84:16;85:8;
88:18;97:4;98:8,8,14;
106:17;107:8;122:2
full (1)
75:25
fully (2)
68:1;76:16
furnace (4)
73:6;142:9,12;
148:13
further (2)
155:4,10
future (1)
57:8

G

GAF (10)
24:11,17;35:17,23;
36:14;104:18,20,24;
105:12;163:16
gal (1)
110:17
garage (42)
10:11,11;13:8,12,16,
18,21;14:25;15:2;31:8,
10;32:16;33:6,16;34:9,
12,16;52:23;54:3,5,9,
17,19;55:5,7,10;64:4;

73:23;74:25;86:22;
126:12;128:7,12,16,19,
22;142:8;145:18,20,
23;147:22;148:11
garage! (1)
61:1
Gary (1)
46:1
gate (1)
84:16
gave (13)
34:23;49:13;91:12;
92:12;110:22,23;
116:12;126:10,14;
129:3;143:7;154:7;
157:20
general (1)
59:5
gentleman (2)
56:7;110:15
gentleman's (1)
79:1
gentlemen (1)
24:1
given (4)
6:9;80:7;157:16,18
giving (4)
51:14;85:17;109:12,
17
Glass (8)
90:5,12,14,14;91:1;
132:22;133:6,14
goes (3)
26:21;116:6;147:16
good (5)
76:1;107:5;113:19;
115:1;116:4
Goodman (9)
46:23;49:7,13,17,19,
21,24;50:2;85:24
go-to (1)
68:14
graduated (1)
9:6
Granules (1)
24:18
Granville (4)
122:6,12,14,25
Granville's (1)
122:22
gravel (8)
75:25;76:1,3,5;86:7,
18;87:5;88:20
Greg (6)
94:10;130:4;135:17;
136:20;137:11;139:6
grew (1)
92:22
Griffith (2)
119:23;120:4
Griswold (2)
161:11,14
Griswold's (1)

161:25
ground (3)
6:13;24:4;100:10
group (2)
85:20;100:9
guess (22)
11:5,16;23:24;26:12;
33:20;35:10;45:18;
46:6;58:10;60:11;
63:16;71:6;87:22;
90:20;103:11;118:16;
127:18;130:12;137:6;
140:11;147:11;151:6
guessing (3)
27:11;80:11,21
guide (1)
77:24
gutter (3)
86:7,18;91:2
gutters (32)
33:22,23;34:1,5,14;
43:12;46:23;49:7,13,
17,23,25;50:2,5,8,10,
15,19,19;75:22,23;
76:2;85:24;86:1,22,24;
87:3,5;88:19;144:1,2;
147:21
guy (2)
68:14;116:8
guys (4)
73:7;95:13,19;101:4

H

H&H (7)
56:3,11,25;58:18;
99:8;101:22;103:8
Hagen (1)
125:10
hail (73)
11:12;16:5;17:20;
18:4;19:19;20:2;21:23;
23:21;24:2,8,19;25:11;
26:7;31:23;34:20,23;
35:13;36:16,25;40:12,
15;42:24;43:3,8,18;
44:18;45:6;46:8,15,19;
49:24;53:16;55:10;
57:7;60:25;61:7;64:13,
18,24;65:2;66:15;74:8;
80:3,9;81:1,3;82:22;
84:11;85:8;106:23,25;
126:16;127:15;128:18;
142:5,6,8;143:12,17,
21,23,24;145:19;
151:14,17,20;156:25;
157:5,5;158:16;
159:14;160:17,25
hailstone (2)
35:20;36:3
hailstones (2)
35:2,6
hailstorm (24)

13:2;14:8;15:12,16,
22;16:9,12;19:18;21:1;
23:10,14;24:24;25:3,
17;26:3;30:7;35:25;
58:16,22;62:8;89:12;
107:24;162:22;163:1
hailstorms (4)
15:21;35:8;153:2,7
half (2)
100:7;138:5
half-inch (1)
36:24
hammered (1)
74:7
hand (5)
51:21;94:19,19;
135:15,22
handed (5)
52:4;60:3;119:25;
136:24;139:10
handing (2)
76:7;128:9
handle (3)
134:25;139:4;140:11
handling (1)
59:13
hands (1)
156:18
hands-off (1)
155:1
hangers (1)
50:8
happen (1)
77:14
happened (2)
60:19;92:8
happy (2)
47:4;70:16
hard (6)
7:6;26:21;32:10,11;
57:24;89:8
headaches (1)
47:17
headstrong (2)
70:9;72:10
heard (1)
153:7
heart (1)
138:1
Heating (14)
68:9,12,14;72:3;
76:14;107:21;111:22;
112:3;114:10;116:2;
118:3;123:6;124:12;
141:17
Heating's (1)
137:1
heck (1)
98:12
held (3)
9:6,20;97:25
help (2)
10:19;95:25

helped (2)
80:4;140:16
helping (1)
110:15
Herb (2)
149:4,23
Here's (1)
99:22
herself (1)
106:11
high (3)
9:25;46:8;75:22
higher (1)
48:15
highest (1)
7:15
highly (1)
57:7
Highway (1)
110:17
himself (2)
115:24;116:8
Hinkle (2)
51:18;52:13
Hinkley (6)
57:2,3,4,6,13;58:18
hinted (1)
80:24
hire (5)
79:7;94:13,25;116:5;
121:4
hired (8)
78:22;79:13;81:23;
92:7;94:16;96:8;
155:12;156:17
hiring (1)
95:10
History (2)
156:25;157:5
hits (4)
64:13,19,20;82:22
hold (3)
9:5,17;109:6
home (16)
14:16,19;19:21;
20:21;21:11,13,14,19,
22;52:22;53:15;60:10,
12;76:21;92:8;142:6
homeowner (1)
44:12
homes (2)
21:10;86:2
home's (1)
142:7
honest (1)
102:19
hopefully (1)
60:22
hot (2)
72:19,21
hotel (1)
137:23
Hour (3)

Larry Beer, et al. v.
The Travelers Home and Marine Insurance Company

Deposition of Larry E. Beer
January 28, 2020

113:15;114:6,20,20;
120:11;121:14,25;
128:2;130:1;157:18;
160:21,23;161:20
knew (7)
40:5,22;85:14;112:3;
118:14,19;149:12
KNOKE (40)
10:18;22:22;34:2;
39:12,16;58:24;60:2;
70:24;80:15;83:16,19,
22;84:4;96:12,25;
108:1;109:9;111:13;
119:11,20,24;122:7;
130:21;131:5;135:22;
140:2;147:5;148:15,
18;150:1;155:17;
157:9,12,15,24;158:3,
6;159:16;160:2;162:9
knowledge (7)
42:18;46:21;69:15;
77:19;118:7;119:2;
161:9
knowledgeable (1)
79:5
known (2)
29:22;139:17
Koertge (3)
148:24;149:18,20

**L**

lab (1)
163:19
labor (2)
121:16;145:15
ladder (2)
101:1,2
ladders (1)
100:23
lady (1)
50:13
Lancaster (4)
44:2;56:4;61:22;
138:13
language (1)
93:7
large (3)
15:5;16:5;25:12
larger (2)
14:21;35:7
LARRY (3)
6:1;60:25;157:10
last (15)
14:7,8,15,22;15:21;
17:4;66:6;86:23,25;
88:14;110:8;117:22;
120:25;136:15;163:3
lasted (1)
100:6
later (10)
21:20;22:21;29:22;
31:25;32:14,17,20,23;

33:1;152:21
latest (1)
17:1
lawn (2)
85:8,9
lawsuit (4)
17:13;18:5;20:18;
155:5
lawyer (3)
94:1,3;138:13
lawyers (2)
139:3,4
lead (1)
12:23
leads (2)
36:11;87:22
leak (2)
66:7,12
leakage (1)
83:20
leaks (3)
65:25;66:3,5
learn (3)
20:25;21:4;79:21
learned (1)
62:12
least (2)
43:12;100:9
leaving (1)
117:2
led (1)
134:22
left (5)
22:4;31:4;67:2,5;
116:25
legal (1)
140:3
less (4)
73:3;103:11;109:25;
110:24
letter (29)
39:10,20;44:15;
53:12;122:3;130:5;
131:21;140:12,24;
141:3,6;144:14;
147:16,25;148:16,19;
149:16,20,23;150:2,4,
19;151:1;155:19,24;
156:2,5,8,22
letters (1)
111:20
letting (1)
155:1
level (3)
7:15;24:5;100:10
license (15)
8:25;9:2;70:11;
113:1,3;117:23;118:2,
3,11,12,17,23;119:7,
14;120:9
licensed (6)
23:16,23;36:22;
76:13;118:4,5

licensing (2)
80:5,7
life (1)
8:11
lifetime (4)
35:17;41:20;62:23;
63:9
lightly (1)
55:14
limiting (1)
148:6
line (1)
117:22
linear (2)
144:1;146:4
liner (1)
17:1
lines (1)
81:11
lining (1)
120:6
list (3)
162:20,20;163:5
listening (2)
70:9;101:14
lists (1)
141:9
little (15)
8:20;23:2;35:9;
44:11;73:4;75:12;85:3;
87:23;97:13;98:23;
103:21;107:25;121:20;
131:8;163:3
livable (1)
110:16
live (3)
26:11;84:23
lived (1)
7:11
living (3)
33:11;91:5;103:1
LLC (3)
49:13;56:11;126:3
local (7)
114:6;115:3,4,6,8;
120:12;126:4
locations (1)
134:13
long (11)
7:11;8:9;9:12;27:16;
89:7,10;91:1;100:5;
115:2;138:7;139:17
longer (3)
35:24;108:11:144:24
look (21)
22:11,21;31:7;38:9,
9,14,17;39:12;41:12;
54:12;55:8;67:18;
75:23;78:23;90:6;
97:15;112:16;122:16;
130:22;140:23;161:23
looked (6)
31:14;63:16;83:1;

86:23;105:13;152:5
looking (12)
22:20;23:4;32:13;
36:18;61:17,20;79:24;
85:7;88:2;118:2;
121:10;143:22
looks (9)
50:21;54:8;60:4;
68:16;84:15;85:2;
144:19;145:22;159:14
loss (1)
20:17
lot (6)
21:10;64:18;65:18;
77:5;116:11;163:9
loud (1)
34:3
low (1)
39:23
Lunch (1)
121:22

**M**

machine (1)
117:7
Madison (3)
80:11,21;81:1
mailing (1)
24:15
main (1)
22:18
maintenance (3)
16:19,20,24
major (1)
7:25
makes (2)
6:18;7:5
making (5)
39:23;56:23;118:9;
119:10;139:18
male (2)
124:17,19
manner (1)
146:22
manufacturer (1)
41:6
manufacturer's (2)
9:12;42:13
manufacturing (1)
9:11
many (14)
16:16;17:9,15;26:10,
12,15;27:1,9;64:19;
82:22;100:1;142:23;
144:1;163:20
March (19)
15:16,22;16:10,16;
17:5;20:18,21;21:1;
23:10;27:7;98:4,16;
139:6,24;152:12;
153:3,11;158:13,14
mark (33)

39:7;47:1;49:9;
51:14,21;56:5;65:1;
67:14;73:17;75:2;
83:11,12;89:14;96:11;
108:3;109:5;119:17;
122:5;123:11;125:18,
24;128:9;130:8,24;
133:23;135:15;137:9;
139:5;140:19;155:14;
158:2,2;162:2
marked (53)
23:20;39:8,11;49:10;
51:22;52:4;56:9;59:2;
60:1,3;62:14;67:15;
68:17;73:18;75:4;78:3;
82:20;83:14;89:16;
96:15;97:3;108:6;
109:7;119:18,25;
121:23;122:2,8;
123:12;125:21;126:1;
128:10;130:10,23;
131:1;134:1;135:19;
136:15,21,24;137:12;
139:8,10;140:12,21,24;
141:3;149:17;155:15,
25;158:8;162:4,10
marks (1)
64:7
marred (1)
31:20
married (1)
71:11
master's (3)
7:17,20;8:2
matches (1)
13:19
material (2)
121:17,18
materials (1)
121:16
Matt (2)
138:10,12
matter (1)
138:4
may (10)
32:14;39:21;60:7;
71:4,20;78:19;103:20,
22;158:21;159:10
maybe (14)
16:2;17:10;19:16;
21:20;39:3;51:18;
70:19;86:4;89:18;
100:7;105:22;106:5;
138:5;154:4
McCombs (9)
29:19;30:16,20;38:1,
4,9;40:9;71:8,9
mean (12)
14:19;19:16;30:22;
32:11;52:14;90:22;
91:3;94:18;114:9;
121:15;137:24;144:14
meaning (1)

Larry Beer, et al. v.
The Travelers Home and Marine Insurance Company

Deposition of Larry E. Beer
January 28, 2020

129:19
**opinions (1)**
123:1
**opportunity (1)**
160:5
**opposed (5)**
6:17;61:9;124:21;
127:13;129:24
**option (1)**
54:24
**options (1)**
54:9
**order (15)**
7:18;21:16;32:4;
51:19;67:11;70:18;
95:25;104:6,9;105:3;
106:6;107:1;129:14;
144:17;163:18
**orders (1)**
160:6
**original (4)**
15:3,13;47:23;48:24
**originally (1)**
28:21
**originating (3)**
66:12,15,17
**others (4)**
67:19;134:5;137:16;
148:5
**Otherwise (1)**
19:22
**ought (1)**
158:3
**out (95)**
23:20;25:21;29:7,19;
31:22;34:2;41:11,21;
44:2,2,3;45:23;46:24;
50:10,12,21;51:6;
52:10;53:4;56:4,23;
60:9,22;65:20;66:22;
67:18;69:6;70:4,20;
71:18;72:4,16,18,20;
73:14;74:9;76:1;79:14;
83:11;85:7;86:25;87:3;
95:21;96:5,7;97:9,24;
101:23;105:1,4,12;
107:1,5;110:23;
112:10,17;113:12,14,
16,17;114:1,3,14,18,
23;115:9,12,14,15;
116:6,17;117:13;
118:23;119:3;120:8;
122:22;123:5;124:1;
125:10;129:11;132:23;
133:1,4;134:25;
135:23;137:25;139:21;
151:13,24;152:5,7,14,
15;153:4;156:18
**outlined (1)**
150:5
**outside (1)**
85:3
**over (21)**

19:17;44:18;45:1;
48:4;54:21;91:6,7;
92:18;112:9;130:6;
135:22;136:2;143:2,5,
7;145:4,5,13;146:3,12;
147:14
**Overhead (16)**
73:14,20,22;74:1,5,8,
18,22;105:19;106:1,
13;125:13;128:14;
132:23;145:18;147:22
**Owatonna (2)**
41:12,13
**Owens (2)**
163:13;164:1
**own (1)**
101:2
**owned (8)**
8:13;9:8;11:4,18,21;
15:20;27:14;76:13
**owner (3)**
58:7;127:18;134:12

**P**

**packaging (1)**
24:15
**page (7)**
78:8;97:4;128:13;
129:3;148:23;150:2,2
**pages (5)**
84:1,6;85:20;130:7;
136:19
**paid (7)**
19:4;41:20;47:6;
106:7;109:20;110:25;
112:15
**paint (26)**
12:23;40:18,20;41:8,
9,13,19,20;42:6,8,9,10,
15,19,22;51:7;52:11;
53:20;55:8,22;56:8;
57:9,18;88:5;99:8;
127:10
**painted (15)**
33:4;40:25;41:1,2,
22;51:5;54:6;55:5,12,
19;56:22;103:2,4;
107:3;147:3
**painter (2)**
101:22;107:4
**painters (1)**
91:3
**painting (21)**
41:17,25;45:2;54:21;
56:3,11,25;58:18;
95:18;99:8;101:22;
102:22;103:9,11;
107:2;122:12;146:11,
12,19;147:9;148:12
**Pam (4)**
69:5,23;70:5;71:5
**papers (1)**

53:2
**paragraph (6)**
141:25;142:2;147:6,
7,12,13
**pardon (6)**
9:1;37:19;54:18;
99:5;126:6;133:13
**park (3)**
26:3,18,23
**Parker (41)**
29:22;40:9;42:24;
47:20;48:2;52:14,16,
17;70:1;71:2,16,21;
73:10,10;82:3;89:3;
91:9;92:11;93:7;
100:14;101:11;108:8,
18,25;109:14;111:2,6,
8,16,24;112:7;117:25;
119:6,14;120:2,15,20;
134:4;135:6;137:15,18
**Parker's (2)**
99:20;102:12
**part (6)**
18:10;21:12;30:5;
87:13;133:17;157:12
**particular (13)**
12:10;27:23;28:9;
33:6;36:4;42:6;64:9,
20;65:21;77:20;
111:20;134:21,21
**partly (1)**
77:23
**parts (5)**
31:15;43:2,12;51:1;
76:15
**pay (6)**
14:3;18:11;48:5;
53:23;55:4;106:9
**paying (1)**
108:1
**payment (2)**
39:22;44:15
**people (27)**
25:7;66:22;70:10,14;
80:7;89:6,8;90:25;
91:2,3,5,6,7;92:7;
93:20;95:19;101:25;
102:13,24;103:1;
106:6,9;107:22,24;
113:19;115:6;120:6
**per (2)**
64:19,20
**percent (1)**
59:9
**per-foot (1)**
146:8
**performed (1)**
130:18
**pergola (18)**
31:12;32:15,15;
45:20;51:2;98:5,6;
121:6,12;122:16,18;
129:4,9,14,16,22;

145:4;148:10
**period (2)**
16:3;17:7
**person (7)**
92:20;100:25;
115:14;116:3,5;117:5;
118:22
**personal (2)**
117:12,16
**personally (5)**
23:9;24:8;36:2;
41:22;128:19
**persons (1)**
115:16
**Peter (1)**
121:25
**petty (1)**
101:3
**phone (16)**
12:18;25:2,4;59:22;
86:4;91:19;92:20;
112:9;116:25;117:6,
12,15,16,20;120:16,17
**phones (1)**
117:13
**photograph (11)**
84:10,13;85:6,7,10,
21;86:3,5,17;88:14;
161:17
**photographs (16)**
35:6;83:2,4,8,12,17,
25;85:2,4,5,17,21;87:8;
88:22,23;160:17
**physical (1)**
132:1
**pick (2)**
7:18;50:12
**picked (1)**
44:12
**picture (5)**
65:5;84:10,15;86:10;
87:19
**pictures (11)**
34:23;35:1,4,8;65:6;
84:1,5,9;87:11,14,16
**pieces (2)**
50:12;65:23
**pile (3)**
76:1;84:11;157:16
**pipe (1)**
88:18
**place (1)**
21:16
**planning (1)**
121:3
**Plastics (1)**
8:18
**Platteville (1)**
70:18
**please (4)**
117:24;130:22;
132:5;150:3
**pliable (2)**

104:16,19
**Plumbing (5)**
72:2;123:6;124:12;
137:1;141:17
**plus (4)**
7:19,20;86:14;
106:24
**pm (2)**
119:22;164:11
**point (25)**
13:13;22:6;44:17;
45:12;47:11;78:23;
99:20;100:22;103:20;
107:7,17;108:14;
114:15;115:19;116:14,
20;123:5;124:3;
132:22;134:14;138:9,
18;151:16;156:18;
163:12
**pointing (2)**
25:21;65:20
**points (1)**
91:19
**poles (4)**
33:3;98:7,14;125:14
**policies (1)**
37:18,21
**policy (13)**
28:1,5,12,15,17;
78:15,16;97:20;
138:15,22;140:1,8;
141:6
**porch (6)**
98:8,8,15;106:18,22;
107:9
**Porter (12)**
79:3,4,7,17;81:13,
19;82:19;83:2;93:14;
99:10;100:24;103:19
**Porter's (2)**
80:2;82:5
**position (6)**
89:20;90:21;141:22;
146:24;147:1,2
**possible (3)**
20:2,8;127:22
**Prairie (1)**
44:2;61:22
**precipitated (1)**
124:5
**preferred (1)**
90:13
**present (4)**
29:25;30:17;98:24;
121:25
**presented (3)**
17:22;18:3;22:6
**pressure (7)**
53:15;55:13;145:5,
10,12;146:15;147:3
**presume (1)**
102:5
**pretty (11)**

Larry Beer, et al. v.
The Travelers Home and Marine Insurance Company

Deposition of Larry E. Beer
January 28, 2020

94:9;98:22,24;132:2
reiterated (1)
    120:11
related (3)
    13:24;41:17;42:15
remember (76)
    12:11,25;15:23,25;
    16:9;17:21;18:22;19:3,
    15;20:1;21:6,12;22:20;
    25:10,19;27:20;29:12,
    16,17;30:25;31:3;32:4;
    37:25;44:4;45:11,21;
    46:9;53:6;56:24;57:17,
    24;60:9,17;65:1;66:22;
    69:18,21;79:22;83:3,4;
    84:8,14;85:6;92:10,19,
    24;93:7;97:11;100:25;
    101:18,25;102:11;
    103:5,13,16;105:15;
    108:1;116:22;117:10;
    121:17;125:20;127:17;
    131:13;133:5,19;
    149:9,12;151:3;
    152:18,21;153:22;
    159:1,6,9,12,18
remembered (1)
    59:5
remembers (1)
    160:8
reminded (1)
    134:19
removal (1)
    126:19
remove (1)
    132:5
removed (1)
    163:23
removing (1)
    104:23
renovations (3)
    11:22;14:9,14
rep (17)
    9:11,12;40:21;41:4,
    6,21;42:14;52:19;
    55:22;56:8;58:21;
    69:24;93:15,19;99:8;
    101:21;102:2
repaint (4)
    53:12,18;56:1;
    127:22
repainted (6)
    12:24;42:1;56:17,18,
    20;146:16
repainting (7)
    50:22;51:1;101:19;
    103:14;126:23;127:6;
    129:9
repair (19)
    8:15;19:9;45:2;
    73:21;89:4;92:7;95:17,
    21;110:3;121:4,18;
    125:13;127:22;129:24;
    142:10;144:16;146:22;

148:8;163:6
repaired (10)
    11:15;27:15;57:8;
    61:8;77:4,12,13;98:15;
    110:21;127:13
repairing (2)
    10:24;108:12
repairs (18)
    10:25;11:3,6,21;
    14:16,20;19:7;40:3;
    98:2;102:6;122:18;
    123:1;132:16;137:4;
    144:8,13;148:10,12
repeat (1)
    80:15
rephrase (2)
    6:15;18:18
replace (21)
    14:3,12;18:6,10,13;
    27:6,9;50:11,12;61:12,
    18,18;65:14;72:7,14;
    73:21;121:9;142:11;
    161:12;162:25;163:6
replaced (34)
    11:15;13:20,22,23;
    14:22;18:11;19:11;
    26:2,23;27:2;37:8;
    48:17;50:3,6;65:18;
    68:1;69:9;70:22;72:19;
    77:4,13;98:10,15;
    114:12;123:20;124:21;
    127:13;143:3,6;144:2;
    146:5,14;147:1;161:14
replacement (16)
    13:25;97:21;126:11,
    15,19;127:1,4;128:23,
    25;129:1,22;136:10;
    141:18;146:8;148:10,
    13
replacing (10)
    26:6;61:9,13;62:7;
    86:1;104:1,3;107:23;
    114:16;128:22
replied (1)
    156:7
report (6)
    35:24;95:15;102:9;
    156:25;157:4,5
REPORTER (1)
    80:17
reports (1)
    153:7
represent (2)
    6:7;62:16
representative (3)
    49:16;122:22,25
representatives (1)
    78:10
reprime (1)
    107:1
request (3)
    99:20;134:22;156:8
requested (6)

47:20;48:2;99:17;
    100:2;120:7;156:9
requesting (1)
    120:8
requests (1)
    83:7
residential (4)
    7:8;41:17;42:7,15
resistance (1)
    160:25
respect (9)
    12:15;42:6;53:14;
    54:3,9;131:24;145:22;
    146:2;147:9
response (8)
    78:20;83:7;102:12;
    111:2;112:5;140:19;
    156:13;157:13
responsible (2)
    110:21;113:19
rest (3)
    55:5,7,10
restained (1)
    129:17
Restate (1)
    149:19
result (2)
    18:1;19:4
resulted (1)
    20:3
results (1)
    164:2
retired (1)
    8:9
returned (5)
    22:24;23:3;25:15;
    34:18;116:19
reviewed (1)
    160:16
reviews (2)
    134:8;141:1
ridge (1)
    61:3
right (166)
    6:21,22;7:8,15,21,
    22;8:7,24;9:22;10:1,3,
    6,21,24;11:2,19;12:4,
    13;13:3,12;15:6,20;
    17:11,15;18:8;19:9,14;
    20:25;22:6,18;24:7;
    27:16;28:11,14,21,24;
    30:8;34:22;39:23;
    42:18;44:19,24,25;
    45:3;46:2,5;47:25;
    51:9;52:21;53:8,10;
    54:3,10,16;55:12;
    56:14;59:19,21,23;
    60:1;61:3;62:2,4,9;
    63:22;64:12;65:6,20;
    66:5,11;67:21;68:19,
    21;70:1;71:24;73:2,15,
    20;74:17;75:20;76:7;
    78:3,18,22;79:2;81:23,

24;82:6;83:7;85:17,25;
    86:11,13;88:20;89:12,
    14;92:17;93:1,10;95:3;
    96:3;98:9;102:5;
    103:16;106:24;107:4;
    109:1,3,4,5;111:10;
    112:1,20,22,23;114:8;
    116:18;120:10,13;
    123:18;124:5;125:15;
    126:14;127:21;128:5,
    16;129:4;130:22,24;
    132:20;133:1,6;135:1;
    136:5;137:4;139:19;
    141:12,20;142:15;
    143:4,15;144:22;
    145:6,22,25;146:23;
    148:6;149:14,22,25;
    150:17;152:13,17;
    153:2;156:5;157:14;
    158:12;160:10;161:6;
    162:17;163:10,14,22,
    25;164:4,8
ring (2)
    32:22;45:20
road (3)
    26:17;76:1;144:18
Rob (1)
    52:8
role (1)
    59:16
roof (115)
    10:6,12;11:5,6,15,
    22;13:20,21,23;16:17,
    22,25;17:4;18:6,10,11,
    14,16,19,20;19:7,10,
    11,13,13;20:3,6,9;
    22:11,13,25;23:5,7,9;
    24:8,9;27:13;31:5;
    35:15,17,19;36:4,17;
    38:22,23;39:1,2;43:18,
    22,24;44:19;60:25,25;
    61:10,12,14,19;62:22,
    23;63:1,3,3,8,15,16,20,
    23,25;64:2,7;65:11;
    66:13,16;67:18,25;
    75:12,18,19;76:4;
    78:23;80:3;81:4,5;
    82:6,13;83:5,8;84:2,9;
    86:12,15;87:9,13;
    95:18;100:12,14,19,23;
    103:17;105:2,16;
    142:8;143:3,5,13,16,
    20;160:21,21;161:9,14,
    20,24,24,25
roof! (1)
    61:4
roofer (3)
    9:20;61:17;91:2
roofers (4)
    36:21;37:6;61:20;
    82:18
roofing (4)
    11:7;68:6;104:4;

105:5
roofs (29)
    10:10,22,24,25;11:3,
    23;14:3;16:15;19:16;
    25:24;26:2,5,7,8,23;
    27:2,6,10;33:20;37:3,7,
    9,12,23;62:7,24;103:3;
    142:2;147:21
room (3)
    66:19;83:21;102:18
rotten (3)
    65:14,16,23
rude (1)
    47:10;135:6,13
rules (1)
    6:13
run (3)
    69:7;115:2;163:18
running (1)
    51:4;73:7
Ryan (2)
    134:4;137:15

S

safety (1)
    8:1
sales (1)
    41:5
salesman (1)
    28:19
salesperson (1)
    42:21
same (15)
    7:5;13:4,15,22;21:3;
    43:8;68:4;70:21;77:1;
    81:11;82:14,17;
    100:20;102:6;123:19
sand (6)
    58:2;127:9;129:14,
    20;145:7,8
sanded (7)
    55:14,17;57:22;
    107:1;129:17;145:9,12
sanding (4)
    57:25;126:23;127:6;
    129:9
satin (1)
    53:19
satisfied (1)
    19:3
saw (9)
    24:12;33:23;35:13;
    46:14,16;64:24;86:18;
    91:22;161:17
saying (2)
    81:5;102:14
schedule (1)
    29:8
scheduled (1)
    29:11
school (1)
    9:25

Star (8)
  12:7,8,11;24:9;
  104:22,23;105:11;
  163:23
start (5)
  14:7;89:12;105:6;
  141:15;150:21
started (4)
  32:3;40:15;115:9;
  121:10
state (4)
  23:16;95:12;146:17;
  147:16
stated (1)
  91:9
statement (4)
  57:13;80:23;137:22;
  141:20
State's (1)
  118:25
status (4)
  150:18;154:6,15,23
stay (1)
  134:25
steel (5)
  27:13;74:11,14,15,
  16
step (1)
  41:14
still (9)
  8:7;12:8;13:15;15:2;
  44:17;55:8;117:23;
  131:18;133:17
stipulate (2)
  84:4;148:15
Stones (1)
  76:6
stood (1)
  111:22
stop (3)
  63:4;134:23;135:3
storm (32)
  13:24;16:6;17:5;
  20:3,7,10,18;21:8;
  23:7;25:6;27:2,7,17;
  35:12;36:5,15;40:24;
  50:16;53:8;65:12;66:1,
  3;68:10,13;86:24;
  88:12;98:4,16;104:12;
  144:23,25;163:7
story (1)
  79:13
Street (9)
  7:10;11:18;26:3,11;
  84:16;85:22;86:11;
  88:18;161:18
streets (1)
  26:4
strict (1)
  119:1
strictly (1)
  113:10
Strike (3)

  63:18;152:2;155:8
strip (1)
  106:23
stripped (1)
  12:23
stuck (1)
  114:16
study (2)
  8:16;35:10
stuff (2)
  22:21;85:17
style (1)
  63:6
subject (4)
  17:18;18:19;19:19;
  108:4
submit (1)
  147:17
submitted (1)
  141:16
Suffice (1)
  39:22
sufficient (1)
  132:8
suggested (1)
  61:13
suggestion (1)
  61:12
summary (5)
  141:14,25;142:15;
  147:8,13
summer (3)
  72:22;152:22,22
sunroofs (1)
  87:25
sunrooms (1)
  87:25
supervisor (1)
  99:21
supply (2)
  117:24;118:2
supporting (1)
  38:4
suppose (1)
  158:3
supposed (1)
  116:17
sure (34)
  10:19;18:3;25:7,18;
  26:14;31:23;36:9;47:3;
  49:3,5;50:13;58:24;
  59:7;70:6;82:4;90:8;
  92:14;98:11;107:12;
  108:9,21;110:6;
  117:19;118:13,15,15;
  120:21;121:21;133:19;
  134:7;140:3;146:18;
  149:20;155:7
surface (3)
  16:22;42:7;43:18
surfaces (2)
  57:9;58:2
surprised (1)

  81:18
surrounding (2)
  104:24;105:11
switched (1)
  27:23
sworn (1)
  6:2
system (7)
  76:16;114:11,23;
  115:1;123:23;124:3,21
systems (3)
  76:20,22,23

                  T

talk (6)
  6:25;21:18;43:17;
  50:25;75:12;96:4
talked (8)
  44:21;61:24;98:23;
  101:20;103:8;116:10;
  124:7,25
talking (27)
  7:5;18:4;41:25;43:9;
  45:14;52:18;65:15;
  69:23;71:5;76:5;79:25;
  81:2,16;83:20;91:3;
  93:16,20;94:20;95:23,
  24;102:1;109:16;
  112:7;113:2;118:20;
  158:4;163:10
talks (1)
  78:19
tall (1)
  92:13
taller (1)
  39:2
Tami (1)
  161:11
tattered (1)
  31:24
taught (2)
  9:24;80:8
teach (1)
  80:10
teacher (3)
  8:5,7,11
teaching (4)
  7:17;9:3,7,24
team (1)
  113:10
technical (1)
  53:2
technology (3)
  8:1,4,17
Teed (2)
  14:2,3
Television (2)
  15:8;89:10
telling (2)
  31:3;67:2
Ten (5)
  8:10;14:8,15,22;

  92:13
tentatively (1)
  148:24
tenth (3)
  26:25;27:3,5
ten-year (1)
  16:2
terminology (1)
  57:17
terms (14)
  11:3;33:5;37:7;
  42:18;59:8;63:2;69:11;
  94:19;97:20;113:7;
  115:4;150:4,9;156:10
terribly (2)
  32:10,11
test (6)
  64:9,15;65:2;82:20,
  23;164:1
testified (2)
  6:2;163:12
testing (3)
  69:19;123:22;163:13
Texas (1)
  110:13
theory (1)
  90:25
thickness (1)
  63:7
thinking (2)
  93:11;101:3
third (3)
  121:1;135:21;136:13
Thompson (1)
  80:5
thorough (1)
  44:14
though (9)
  10:1;44:8;53:8;57:7;
  90:9;92:25;101:15;
  140:16;143:11
thought (12)
  51:18;67:12,25;91:9;
  92:9;93:8,16;95:16;
  98:8;151:17,20;154:18
thoughts (1)
  151:16
thousands (3)
  109:24,24;110:24
three (13)
  11:23;43:25;48:4;
  57:23;60:23;63:11;
  67:17;79:25;89:11;
  101:21;110:14;136:3;
  163:21
three-tab (2)
  63:2,5
threshold (2)
  36:3,16
throughout (2)
  91:17;157:7
tied (1)
  99:15

times (6)
  16:16;41:11;64:18;
  65:18;81:20;116:11
titled (1)
  162:12
today (6)
  13:4;22:21;34:18;
  56:17;98:2;163:10
together (1)
  152:23
told (35)
  21:5,8;34:19;36:23;
  37:5;43:23;46:16,20;
  47:7,8,11,22;48:7,20;
  67:4;72:3,12;78:16;
  79:12;89:2;90:16;
  93:14;101:4;105:20;
  108:11,17;109:4;
  113:22;123:18,19;
  134:24;145:11;154:10,
  13,19
Tollefson (4)
  160:10,12,18,20
Tollefson's (1)
  161:24
Tommy (1)
  80:5
took (6)
  24:14;28:3;86:3;
  87:11;121:10,16
Tools (1)
  41:12
top (2)
  14:20;84:11
total (7)
  81:19;89:10,20;
  109:22;126:10;132:15;
  137:4
totaled (1)
  110:23
totally (3)
  14:22;127:13;146:14
touch (4)
  28:18;152:1,3;154:9
touchy (1)
  73:8
tough (2)
  34:24;121:18
toward (2)
  8:2;117:25
towards (3)
  7:20;8:3;162:8
town (1)
  115:20,22
trained (1)
  70:11
training (3)
  42:6,13,14
transcribe (1)
  6:19;7:6
Travelers (81)
  6:8;22:7,15;27:17,
  24;28:2,4,23;29:1,7;

Larry Beer, et al. v.
The Travelers Home and Marine Insurance Company

Deposition of Larry E. Beer
January 28, 2020

wonder (1)
103:4
wood (13)
53:16;54:14;57:19;
65:14,15,23;94:4,6,7;
99:5,6;121:8,12
word (2)
79:14;81:6
words (5)
46:18;93:18;104:16;
108:2;135:6
work (41)
12:6,11,14,20;18:13;
21:15;28:2;41:17;47:6,
12,15;48:19;49:2;
55:23;56:13;73:1,2,12;
74:23;76:17;77:5;
90:11;106:10;110:13;
113:12,17,20;116:3;
121:6;126:5,9;128:2;
129:4;130:2,18;133:7,
9;144:16,17;155:2;
160:6
worked (5)
7:17;62:5;74:18;
80:6;115:23
workers (2)
85:21;161:17
working (7)
8:2,3;49:6;59:14;
76:19;85:22;98:21
works (2)
58:9;113:10
worth (3)
14:4;76:17;109:25
wounds (1)
57:16
write (7)
70:18;89:9;90:15;
102:25;106:6;109:23;
110:8
written (2)
95:13;132:15
wrong (2)
10:19;130:23
wrote (6)
48:14;52:21;74:9;
78:5;124:7;133:8

Y

yard (1)
84:16
year (4)
15:25;16:18;72:6;
76:18
years (26)
7:12,14;8:10,13;
9:14;11:19;12:22;13:1,
2,13,13;14:8,13,15,22;
15:18,21;17:7,9,10;
33:11;40:21;57:23;
60:23;79:25;91:4

Yep (4)
35:3;58:12;114:24;
135:8
young (1)
110:17

0

07 (1)
13:9
09 (1)
12:3

1

1 (10)
39:7,8,11,19;135:18;
136:6,14;141:16,25;
159:21
10 (8)
89:15,16;96:22,23;
97:3,4;156:24;157:2
10th (4)
7:10;11:18;12:3;
26:11
11 (8)
84:1,6;96:11,15,17;
146:10;147:6,7
112-year-old (2)
13:6;14:16
12 (9)
29:11,13;30:9,11;
108:3,6;159:1,4,5
12:42 (1)
119:22
13 (6)
45:19;109:6,7,13;
111:4;115:5
14 (8)
119:17,18;120:1;
137:16;141:9;147:12,
13,22
15 (4)
121:23;122:2;
130:16;158:21
16 (6)
122:6,8,10;123:4;
155:20;156:3
17 (5)
49:14;123:11,12,15;
159:5
18 (2)
8:13;125:21
19 (3)
125:24;126:1;159:7
1978 (2)
10:15,22
1983 (2)
15:11,13
1987 (1)
9:16
1997 (1)
10:14

2

2 (6)
49:9,10;129:3;142:2;
147:21;159:10
2:08 (1)
164:11
20 (9)
128:9,10,13;130:7;
139:6,24;150:3,8;
152:12
2009 (8)
12:4;13:21,24;16:15;
18:16,21;19:13;35:16
2017 (44)
15:16,22;16:16;17:5;
20:18,21;21:2;23:10;
27:7;29:2,11,13,25;
30:9,11;45:19;49:14;
53:8;60:7;72:22;96:24;
97:2;98:4,16;120:15;
124:2;130:16;131:4,
14;133:3;134:5;
135:18;136:6,15;
137:16;153:3,11;
157:7;158:14,21,24;
159:1,4,7
2018 (24)
72:23;139:6,24;
144:15,24;145:13,19;
146:13,20;147:25;
150:19;151:2;155:18;
156:3,5,9,21,24;157:2,
7;159:10,13,19,21
21 (5)
124:2;130:8,10,17,
22
22 (9)
13:13;130:25;131:1,
3,4,5,10,12;132:21
23 (17)
13:13;15:16,22;
16:10,16;17:5;20:18,
21;21:1;23:10;27:7;
133:24;134:1;135:14;
153:3,11;158:14
24 (6)
78:19;135:16,19;
136:1,15,18
25 (2)
136:21,24
26 (5)
108:4;137:9,12,22;
155:18
27 (4)
139:6,8,11;140:12
28 (8)
53:8;109:10;140:20,
21,25;141:4;149:17;
158:24
29 (7)
96:24;97:2;119:22;

3

3 (6)
51:21,22;52:4;53:1;
60:7;147:21
30 (5)
19:17;39:2;134:5;
158:6,8
31 (5)
162:3,4,10,20;163:5
35 (2)
7:12;110:17
36 (5)
7:13,14;11:19;15:21;
33:11

4

4 (5)
56:6,9,11;144:4;
147:21
4,000 (1)
11:4
40 (1)
39:3

5

5 (4)
29:2;59:2;60:1,3

6

6 (5)
67:14,15;68:17;
133:3;150:2
610 (2)
7:10;11:18

7

7 (3)
73:17,18;158:13
70 (1)
90:17
700 (1)
98:10
75 (1)
157:6

8

8 (5)
75:3,4;76:8;78:4;
147:22
80-some (1)
110:18
83 (1)
15:11
85 (1)
110:18

120:15;155:14,15,25

88 (1)
9:16

9

9 (17)
83:13,14;88:23;
144:15,24;145:13,19;
146:13,20;147:25;
150:19;151:2;156:5,8,
21;159:13,19
9/22/17 (1)
131:7
97 (4)
10:16,17;13:10,11
99 (1)
59:9