IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

LARRY BEER and SHARON BEER,

                Plaintiffs,                OPINION AND ORDER

v.

                                                 19-cv-306-wmc

THE TRAVELERS HOME AND MARINE
INSURANCE COMPANY,

                Defendant.

     Plaintiffs Larry Beer and Sharon Beer assert a breach of contract claim and a bad faith claim against their insurer, The Travelers Home and Marine Insurance Company ("Travelers"), based on its refusal to complete the contemplated appraisal process for alleged damage to their home following a hailstorm.  Before the court are the parties' cross-motions for summary judgment.  (Dkt. ##27, 30.)  For the reasons that follow, the court will grant plaintiffs' motion for partial summary judgment in part as to the five categories to which Travelers expressly agreed to invoke the appraisal process, and will grant defendant's as to the breach of contract and bad faith claims in part as to the five categories in which Travelers' expressly refused to complete the appraisal process.  In all other respect, the parties' motions are denied, and plaintiffs may pursue at trial their remaining breach of contract and bad faith claim consistent with this opinion.

UNDISPUTED FACTS[1]

A. **Overview of Parties**

Plaintiffs Larry and Sharon Beer reside as husband and wife at 610 10th Street, Fenimore, Wisconsin. Defendant Travelers issued a policy of insurance to plaintiffs insuring this property for the period February 28, 2017, through February 28, 2018 ("the Policy"). (Def.'s PFOFs, Ex. G (dkt. #29-7) ("the Policy").) The Policy provides coverage for "direct physical loss to the property . . . caused by . . . [w]indstorm or hail." (*Id.* at 11.)

B. **Initial Estimates of Loss**

A hailstorm impacted the Beers' property on March 23, 2017, causing damage to components of the plaintiffs' home and property. On April 5, 2017, plaintiffs provided notice to Travelers of their insurance claim. Travelers' claim handler Kathryn Parker inspected plaintiffs' home on April 12, 2017, confirmed there was hail damage to two shingles on the Beers' garage, soft metal components of the roof to the house and to the garage, the paint on the cedar siding, fascia, pergola, front door and some screens. She also identified and prepared an initial estimate of $5,052.46 replacement cost value ("RCV") and $4,369.78 for actual cash value ("ACV"). (Def's PFOFs, Ex. D (dkt. #29-4).)

---

[1] Defendant submitted their evidence as attachments to the proposed findings of fact, contrary to the court's guidelines on summary judgment and the Federal Rules of Civil Procedure. Fed. R. Civ. P. 56(c)(1). (*See also* Summary Judgment Procedures ¶ I.C.1.f, available at hyperlink at dkt. #8.) Nonetheless, the court has relied on the documents unless plaintiffs have raised authentication or foundation challenges, which the court addresses below where relevant. On their part, plaintiffs attached depositions with all exhibits from the depositions to their attorney's affidavit. While the evidence was submitted in an admissible form, it was unwieldy. For future reference, each document should have been a separate exhibit to Attorney Knoke's affidavit. With those concerns aside, the following facts are material and undisputed, unless otherwise noted.

2

On June 29, 2017, and again on November 1, 2017, Travelers submitted revised estimates of loss, the last of which approved loss in the amount of $10,334.27 RCV and $9,485.24 (ACV). (*Id.*, Ex. E (dkt. #29-5).) This final estimate included: (1) replacement of metal fascia, chimney flashing and vents; (2) replacement of gutters and downspouts on two sides of the property; (3) repainting of a trellis; (4) combing air conditioner condenser fins; (5) reglazing windows; (6) replacing a TV antenna; (7) power washing, resealing, and painting siding; (8) replacing window screens; (9) replacing the front storm doors; (10) replacing damaged shingles; (11) replacing wind spinner and (12) pressure washing, resealing and re-staining the pergola. (*Id.*) Over this period of time, the Beers disputed Travelers' estimates of loss and provided their own estimates. While there appear to be several disputed areas, among others, Travelers' adjusters noted wear, tear and blistering to the Beers' roof that would not be covered under the Policy.[2]

### C. The Appraisal Process

The Policy contains an "Appraisal" provision which provides in relevant part:

> If you and we fail to agree on the amount of loss, either may demand an appraisal of the loss. In this event, each party will choose a competent and impartial appraiser within 20 days after receiving a written request from the other. The two appraisers will choose an umpire. If they cannot agree upon an umpire within 15 days, you or we may request that the choice be made by a judge of a court of record in the state where the "residence premises" is located. The appraisers will separately set the amount of loss. If the appraisers submit a written report of an agreement to us, the amount agreed upon will be the amount of loss. If they fail to agree, they will submit their

---

[2] Travelers' file describes various communications between Travelers and Mr. Beer from April 5, 2017, to March 19, 2019. (Knoke Aff., Ex. 3 (dkt. #33-3) 36-67 (Conklin Dep. Ex. 3).)

3

> differences to the umpire. A decision agreed to by any two will set the amount of loss.
>
> Each party will:
> a. Pay its own appraiser; and
> b. Bear the other expenses of the appraisal and umpire equally.

(Policy (dkt. #29-7) 16.)

On March 20, 2018, the Beers demanded an appraisal of the loss to the property from the March 23, 2017, hailstorm. (Knoke Aff., Ex. 3 (dkt. #33-3) 68 (Conklin Dep. Ex. 7).) Travelers does not dispute that the Beers demanded an appraisal, but disputes that the "invocation of the appraisal proposal was proper, since the parties disputed the cause and existence of damage to numerous items." (Def.'s Resp. to Pls.' PFOFs (dkt. #37) ¶ 13.) In that letter, the Beers named David Miller as their appraiser.

On April 9, 2018, Travelers responded to the demand in a letter from Claims Manager Ryan Conklin, noting that Travelers had investigated the loss and prepared an estimate for the damages and made Actual Cash Value payments totaling $8,485.24. (Knoke Aff., Ex. 3 (dkt. #33-3) 69-74 (Conklin Depo. Ex. 8).) The letter then identified 14 categories of claimed damages and, for each category, summarized the parties' differing views on: (1) whether there was hail damage to each of the categories; (2) the extent or type of damage; and (3) the amount of loss. (*Id.* at 70-72.) Travelers then explained that it "will not submit coverage issues to appraisal," and therefore refused to include five categories in the appraisal: roofs, gutters, TV antenna, overhead garage doors and Bilco doors. (*Id.* at 72.) Travelers also noted that there was no disagreement as to the amount of loss for three of the categories -- storm doors, wind spinner and fire ring cover -- and

therefore there was no need to submit these categories to appraisal. As for fascia, Travelers sought additional information about whether the Beers disagreed with how Travelers had priced the fascia that was covered and whether the Beers believed there was damage to other parts of the fascia that were covered by the Policy.

As such, Travelers indicated that it was willing to submit five categories to appraisal: air conditioner, pergola, garage walk-through door, siding painting, and furnace cap. (*Id.* at 72.) Travelers also "tentatively identified" Eric Koertge as its appraiser. (*Id.* at 73.) Finally, Travelers noted its

> proceeding with appraisal [is] not a waiver of any policy provision, term, exclusion or condition, nor a concession of its position that this matter may not be subject to appraisal. In proceeding with appraisal Travelers does not waive its right to assess appraisal on a case by case basis both on this claim and all future claims and does not waive its rights under the policy or applicable law in any way.

(*Id.*) Travelers closed by requesting that the Beers respond within 20 days as to whether they accept the terms of the appraisal.

The Beers did not respond to the Travelers' letter by the artificial deadline or otherwise agree to limit the scope or method of the appraisal requested. Instead, on or about May 10, 2018, the Beers advised Travelers that a check had not been cashed because "[w]e are waiting for final settlement through the appraisal process." (Knoke Aff., Ex. 3 (dkt. #33-3) 75 (Conklin Dep. Ex. 9).) Similarly, on July 16, 2018, Travelers received a second letter from the Beers, indicating that they did not cash a check because "[c]laim in appraisal, not settled yet." (*Id.* at 77 (Conklin Dep. Ex. 10).)

5

While the Beers did not respond to the April 9 letter directly, there is no dispute that Travelers' appraiser Eric Koertge was contacted by Travelers' Claim Manager Ryan Conklin about the appraisal *and* was provided the Beers' appraisal demand and Travelers' April 9 response. Travelers represents that it did not know that the Beers' designated appraiser Miller had also contacted Koertge. Nonetheless, Koertge testified at his deposition that he believed he and the Beers' appraiser David Miller "were instructed to proceed" with the appraisal, and they did. (Koertge Dep. (dkt. #33-4) 19.)

As a first step, in an agreement dated April 23, 2018, Koertge and Miller selected Tim Hannon to serve as the umpire, if necessary. (Knoke Aff., Ex. 4 (dkt. #33-4) 22 (Koertge Dep. 5).) Koertge and Miller then exchanged a series of emails attempting to arrange a visit to the Beers' property. Eventually, due to conflicts with his schedule, Koertge arranged for his project manager Herb Virella to go in his place. Virella was qualified to conduct an appraisal, having performed similar estimates for hail damage on insurance claims for 42 years. Nonetheless, Travelers maintains that Virella was not serving at its appraiser, but was serving as Koertge's "eyes and ears" at the inspection. (Def.'s PFOFs (dkt. #29) ¶ 32.) At his deposition, Virella testified that he understood: (1) the Beers had a Policy with Travelers; (2) the Beers had submitted a claim to Travelers for hail damage to their property; (3) Travelers had investigated the claim and confirmed there was hail damage; but (4) the parties disagreed on the amount of loss. He further testified that his role was to assess the amount of hail storm loss on the Beers' property. Miller similarly understood his role as determining the amount of loss caused by hail. However, Virella also testified at his deposition that Koertge had not communicated

anything to Virella about the scope of the appraisal or the contents of Travelers' April 9 letter that precedes it.

Regardless, on June 18, 2018, Miller and Virella visited the Beers' property. After reviewing the existing documents, they then broke off to inspect the property separately. Travelers also does not dispute that this visit occurred, while again contending that Virella was not acting as Travelers' appraiser. Neither Miller nor Virella went on the roof. After the inspection, the two spoke and determined that they were in agreement on the value of the loss of various property components, including that the roof needed to be replaced. Virella further agreed to write up the estimate of loss report for Miller's review. Between July 18 and August 7, Miller sent numerous emails to Koertge and Virella, following up on the written estimate of loss.

On August 7, Koertge responded to Miller that "Herb [Virella] will be reaching out to you today to discuss numbers." (Knoke Aff., Ex. 5 (dkt. #33-5) 46 (Virella Dep. Ex. 3).) That day, Virella emailed Koertge and Miller a "rough draft estimate for the Beer loss," acknowledging that the "estimate does not reflect any depreciation." (*Id.* at 48.) Koertge then forwarded to Miller an updated report, which was also dated August 7, 2018, and showed Virella's loss numbers, as well as depreciation. (Knoke Aff., Ex. 6 (dkt. #33-6) 33-38).) The report provided that the Beers' loss from the March 23, 2017, hailstorm was $71,950.84 (real cost value) and $60,326.96 (actual cost value, which accounts for depreciation). (*Id.* at 38.) Miller testified at his deposition that he agreed with this report.

Koertge then asked Miller to draft a final written appraisal award, which Miller did, signing and dating it as of August 30, 2018. (Koertge Dep. (dkt. #33-4) 27; Miller Rept.,

7

Ex. B (dkt. #16-2).) However, Koertge did not ultimately sign the award because he was instructed by Travelers to stop the appraisal process. Similarly, Virella did not sign the award. As for Travelers, it neither disputes that Koertge asked Miller to draft a final written appraisal award, nor that Miller created, signed and dated it. Rather, Travelers contends that it was not an "appraisal award" under the terms of the Policy because Koertge did not sign it and would not have signed it in light of Travelers' position that the appraisal would cover only a limited number of categories. (Def.'s Resp. to Pls.' PFOFs (dkt. #37) ¶ 31.) At his deposition, Koertge testified that this was the first time an insurance company had instructed him to stop an appraisal process.

Over this same period, from April 2018 through October 2018, Larry Beer sent several communications to Miller, instructing him to not allow the "settlement to use the recoverable depreciation," repeatedly stating that he did not trust Travelers, and encouraging Miller to finish up the process. (Def.'s PFOFs (dkt. #29) ¶ 34.) Mr. Beer also provided Miller with multiple estimates that he had obtained for the required work. Plaintiffs do not dispute any of this, except to point out that Miller testified at his deposition that he communicated to Mr. Beer that "there would always be depreciation in any settlement" and that he was not influenced by Beer's opinions. (*Id.*)[3]

On October 16, 2018, Miller contacted Travelers directly to inquire as to the status of the appraisal award. Travelers maintains that this was the first time *it* learned that the appraisal process was proceeding, which plaintiffs dispute, pointing to their May 10, 2018,

---

[3] There is no dispute that the policy only entitles the insured to actual cash value, which accounts for depreciation.

letter to Travelers stating that they were not cashing the check because "[w]e are waiting for final settlement through appraisal process." (Pls.' Resp. to Def.'s PFOFs (dkt. #41) ¶ 53.) That same day, Travelers' Claims Manager Ryan Conklin entered the following account in the Beers' claim folder:

> The appraiser for the insured called and asked about the award. I informed him that we have not heard from the insured after our 4/9/18 letter went out. I spoke with our appraiser who did inspect the loss site with the insured appraiser without our knowledge. I informed our appraiser that we are not in agreement on the terms of the appraisal and asked him to cease the appraisal proceeding until we have heard back from the insured. I followed up with the insured appraiser and informed him that we would be doing nothing further until we have heard back from the insured on our 4/9/18 letter. I sent another copy of that letter along with an additional letter requested the insured reply to our correspondence.

(Knoke Aff., Ex. 3 (dkt. #33-3) 37 (Conklin Dep. Ex. 3).) Consistent with his note to the folder, Conklin also sent an email to the Beers that same day, which stated:

> Please see the attached follow-up to our April 9, 2018 letter as well as the April []9, 2018 letter. As discussed with Mr. Miller, Travelers will not be moving forward with the appraisal process until you have replied to our letter and we are in agreement on the terms of the appraisal.

(Knoke Aff., Ex. 5 (dkt. #33-5) 53 (Virella Dep. Ex. 17).) The attached letter stated that it had received no response to the April 9, 2018, letter, and asked the Beers to respond within 14 days of this letter. (Knoke Aff., Ex. 3 (dkt. #33-3) 80 (Conklin Depo. Ex. 11).)

Before Conklin sent the October 16 letter, the Beers sent Conklin a letter dated October 4, 2018, in which they stated, "Thank you for your concern on not answering your letter directed to me on April 9, but I answered all questions upon hiring an appraiser." (Knoke Aff., Ex. 3 (dkt. #33-3) 82 (Conklin Dep. Ex. 12).)

9

On November 6, 2018, Conklin next emailed Koertge:

> We didn't get much of a response from the insured on our initial letter so we are formulating a response to him again. In the meantime can you please revise your estimate to include only what we are willing to submit to appraisal based on our initial letter attached above [referring to the April 9, 2018].

(*Id.* at 83 (Conklin Dep. Ex. 13).) Koertge responded the same day, creating an amended written report of loss, covering only the categories to which Travelers agreed in the April 9 letter, which provided $9,732.51 in real cost value and $8,573.00 in actual cost value, accounting for depreciation. (Knoke Aff., Ex. 4 (dkt. #33-4) (Koertge Dep. Ex. 10).) On November 13, Conklin directed Koertge to share the amended written loss estimate with the Beers' appraiser, indicating that Koertge should also share the April 9, 2018, letter to the Beers with Miller as a means of explanation for the amended written loss report.

That same day, Mr. Beer sent the following email to Travelers:

> I just got off the phone with my Appraiser. I was curious as why this settlement was taking so long and where he was in finalizing the settlement. According to the policy I read that either party can invoke the appraisal process and that is what I did. The policy did not say that you had the option as to not accepting the process. If you would, please read the appraisal portion of the policy. Your appraiser and my appraiser met at my house and went over the damage inflicted by the hailstorm and set the terms of appraisal. David informed me he had an agreed revised estimate from your appraiser on 8-28-18 and sent out a final award shortly thereafter. Mr. Miller explained that you stepped in the appraisal process and told your appraiser not to sign the award. It seems to me that you had no legal right to do this and are prolonging the settlement process. I would like to know where you stand on the claim and what makes you think you can stop the appraisal's job to settle this claim.

(Knoke Aff., Ex. 5 (dkt. #33-5) 53 (Virella Dep. Ex. 17).)

10

On November 14, 2018, Travelers' Second Vice President Kimberly Burnell sent the following response to Mr. Beer:

> For your reference, I have attached a copy of a letter that was sent to you in April 2018. The letter clearly sets forth what Travelers agreed to appraise and asked for your response within twenty (20) days if you did not agree. Since we did not receive a response from you, the appraisal proceeded with the conditions outlined. Our appraiser was not authorized to act outside of the scope of the items listed in the April 9 letter.

(*Id*.) Travelers did not communicate with the Beers after this letter. Instead, Travelers appears to have closed the Beers' file altogether, and the Beers filed this lawsuit.

### D. Possible Other Hailstorms

Indeed, Travelers did not conduct any further inspection of the property, nor did they notify the Beers of any concern about damages caused by any hailstorm other than the March 23, 2017, one. Although Travelers appears to rely on a "Benchmark Hail History Report," purportedly showing other hailstorms to the Beers' property after the policy period but before the appraisal inspection, that report is simply attached to *defendant's* proposed findings of fact, without any affidavit or declaration ushering it in. While defendant also points to the deposition testimony of Travelers' Claim Manager Ryan Conklin, he did not authenticate the report during his deposition. Instead, he simply testified that "[we] have reports that there was hail that fell at the location post when the policy was cancelled, which again involves a potential new insurance carrier." (Conklin Dep. (dkt. #29-9) 83.) Defendant also points to its expert Jason Webster, Ph.D., who opined that on May 2, 2018, that there was hail activity within 5 miles of the Beers' property, which would fall outside Travelers damage policy period. (Webster Rept. (dkt.

11

#29-25) 30-32.)[4]  For their part, plaintiffs have submitted affidavits in support of their summary judgment motion, averring "there [were] no storms which occurred at our home during" the period from March 23, 2017, through August 13, 2018.  (L. Beer Aff. (dkt. #32-2) ¶¶ 5-6; S. Beer Aff. (dkt. #32-4) ¶¶ 5-6.)

OPINION

I. Motion to Strike Affidavit

Three weeks after summary judgment briefing was complete, on May 12, 2020, plaintiff Larry Beer submitted an affidavit in response to questions asked of him during his deposition about "days Travelers claimed hail might have fallen at our home."  (L. Beer (dkt. #49) ¶ 4.)  The court has not considered this affidavit as part of summary judgment, nor did plaintiffs request that the court consider it as part of their summary judgment brief or in opposition to defendant's motion.  Nonetheless, defendant seeks to strike the affidavit on the basis that it contradicts his prior deposition testimony.

Normally, the court would consider whether a summary judgment constitutes a "sham affidavit." *Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168-69 (7th Cir. 1996) (discussing limitations on summary judgment "affidavits that contradict prior deposition[]" testimony).  Here, however, that characterization proves an odd fit

---

[4] Plaintiffs purport to object to Webster's expert report on foundation and hearsay grounds.  The foundation objection is unclear.  While the expert reports constitutes hearsay and would not be admissible at trial, the report is signed (albeit not sworn), and the court may consider it at summary judgment, assuming Webster would testify to the same at trial.  *See Olson v. Morgan*, 750 F.3d 708, 714 (7th Cir. 2014) ("[T]he Federal Rules of Civil Procedure allow parties to oppose summary judgment with materials that would be inadmissible at trial so long as facts therein could later be presented in an admissible form." (citing Fed. R. Civ. P. 56(c)(4)).)  Regardless, the report is not material to the court's decision.

indeed, given that the affidavit was not submitted in support of *or* in opposition of summary judgment. Nonetheless, because Beer's ability to modify his testimony will likely reemerge in a motion *in limine* or an objection at trial, the court will take up the motion now.

At his deposition, Mr. Beer was asked if he remembered whether he was at his home on specific dates after the relevant insurance coverage period, including May 2, 2018, when hailstorms purportedly hit in the areas surrounding his home. (L. Beer Dep. (dkt. #39) 157-60.) Understandably, Beer indicated that he did not know "for certain one way or another as to whether [he was] at the property on those dates." (*Id.*) In his May 12, 2020, affidavit, Mr. Beer now explains that he has "gone back through my records of that time and discussed with my wife. I can now state with specificity that my records have refreshed my memory regarding May 2, 2018." (L. Beer Aff. (dkt. #49) ¶ 6.) Beer then describes his day in detail, providing credit card transactions in support of his account, and further avers that while there was a rainstorm that evening, "it was not accompanied by any hail at our home." (*Id.* ¶ 8.)

Mr. Beer's affidavit does *not* contradict his prior deposition testimony, but rather reflects a refreshed memory. During his deposition, he simply testified that he could not remember a particular fact; now, with the benefit of the review of records, he is able to aver that there was no hail at their property on May 2, 2018. The Seventh Circuit has repeatedly cautioned restraint in applying the sham affidavit rule, particularly when the witness testifies at an earlier deposition that he or she cannot remember a particular fact. *See Bank of Ill.*, 75 F.3d at 1169; *EEOC v. Aurora Health Care, Inc.*, 12-cv-984-JPS, 2015

WL 2344727, at *5 n.28 (E.D. Wis. May 14, 2015) ("[The witness's] general lack of memory at a specific time is not specifically contradicted by her later memory. Indeed, that is often the nature of memory.").

As such, defendant's motion is denied. At trial, Mr. Beer is free to testify as to his memory of that day, having been refreshed by reviewing his own records, something he obviously did not have access to at the time of his deposition. Of course, defendant may also illicit testimony that during his deposition, he could not recall whether he was at home on May 2, 2018.

## II. Summary Judgment Motions

The parties have cross-moved for summary judgment on plaintiff's breach of contract and bad faith claims. To obtain summary judgment on claims for which they bear the burden of proof, the Beers "must lay out the elements of the claim, cite the facts [that they] believe[] satisfy[y] these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim." *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015). For Travelers to prevail on its motion, the undisputed material facts must demonstrate its entitlement to judgment as a matter of law, shifting the burden back to plaintiffs to come forward with evidence sufficient for a reasonable trier of fact to render a verdict in their favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

In their complaint, plaintiffs assert a breach of contract claim and a bad faith claim against Travelers. Critically, both claims are based on Travelers' refusal to engage in or complete the appraisal process -- or at least, this is plaintiffs' principal theory of liability

14

presented in their summary judgment briefing. As the court explained in its opinion and order denying plaintiffs' motion for judgment on the pleadings, an appraisal provision like that at issue in this case is "grounded in the principles of contract interpretation." *Farmers Auto Insurance v. Union Pacific Rwy. Co.*, 2009 WI 73, 319 Wis. 2d 52, 768 N.W.2d 596. As the Wisconsin Supreme Court explained,

> [a]n appraisal process is an agreement by parties to a contract to allow third party experts to determine the value of an item. The court's role is not to determine whether the third party experts accurately valued the item (as if the court itself could do better job), but whether the third party experts understood and carried out the contractually assigned task. The obvious point of contracting for an appraisal process is to keep a jury or court out of that decision. Courts have an obligation to enforce this aspect of an agreement between parties by asserting only limited power to review appraisal awards.

*Id.* ¶ 42. Because appraisals are "presumptively valid," the court further explained that they "may be set aside only upon the showing of fraud, bad faith, a material mistake, or a lack of understanding or completion of the contractually assigned task." *Id.* ¶ 44.

As the court also explained in its prior opinion and order, Wisconsin courts considering similar appraisal provisions have held that the process can *only* resolve disputes over the amount of loss, rather than be used to determine the existence of coverage itself. *See St. Croix Trading Co./Direct Logistics, LLC. v. Regent Ins. Co.*, 2016 WI App 49, ¶ 14, 370 Wis. 2d 248, 882 N.W.2d 487 (holding that an appraisal panel should only consider the amount of loss and cannot consider questions of coverage); *Farmers Auto Ins.*, 2009 WI 73, ¶ 42 ("An appraisal process is an agreement by parties to a contract to allow third party experts to determine the value of an item."); *Gronik v. Balthasar,* No. 10-CV-00954, 2014 WL 2739333, at *3 (E.D. Wis. June 17, 2014) ("The goal of an appraisal is to resolve

15

valuation disputes over the amount of loss. All other disputes, including whether the claimed loss is covered by the contract, are left for resolution by negotiation or litigation." (citing to *Lynch v. Am. Family Mut. Ins. Co.*, 163 Wis. 2d 1003, 1009–10 (Ct. App. 1991)).

The plain language of the Policy reinforces these holdings under Wisconsin law. As set forth above, the Appraisal provision of the Policy is limited to situations where the insured and insurer "fail to agree on the amount of loss." (Policy (dkt. #29-7) 16.) Practically speaking, this limitation also makes sense. Without it, insureds would always simply invoke appraisal, short-stepping any requirement to show that the loss is covered by the policy. As best as the court can discern, the Beers' position is that upon entering into the appraisal process as to certain losses, Travelers could no longer dispute coverage. That position, however, is not supported by the language in the Policy, Wisconsin cases discussing similar arbitration provisions, common sense, or Travelers' April 9 letter.

While the record here certainly establishes that the Beers invoked the provision in March 2018, it also establishes that Travelers responded promptly by letter dated April 9, 2018, unambiguously explaining that it only agreed to engage in the appraisal process with respect to five of the fourteen categories in which the amount of loss was the only remaining dispute. Travelers further explained that as to three other categories, there was no dispute as to the amount and, therefore, no need to engage in the appraisal process. Travelers also noted a disagreement as to the scope of coverage for any damage to the fasciae. As to the remaining five others, including most critically the roof, Travelers disputed that the alleged damage was covered by the insurance policy.

While the Beers respond by pointing out that *they* "never agreed to Travelers' terms

limiting the scope of the appraisal process" (Pls.' Br. (dkt. #31) 5), they ignore the fact that neither did Travelers. Accordingly, there was never an agreement between the parties that the appraisal process necessarily covered *all* categories of loss, including the particular losses where the parties were not in agreement as to coverage.[5]

In other words, the undisputed facts demonstrate that the parties failed to reach a meeting of the minds as to the scope of the appraisal process. While one party may unilaterally invoke the process, the process itself is limited under Wisconsin law to the areas for which the parties *only* dispute the amount of loss, and necessarily cannot cover areas for which there is a dispute as to coverage. Contrary to plaintiffs' argument, this is not an "extra-contractual" term. The Policy itself limits the appraisal provision to those situations where the insured and insurer "fail to agree on the amount of loss." (Policy (dkt. #29-7) 16.) While plaintiffs are correct that "there is nothing in the Policy requiring the Beers to respond to Travelers' demand to limit the appraisal" (Pl.'s Br. (dkt. #31) 28), the parties must agree on coverage (or set that dispute aside) in pursuing appraisal.

After the Beers' demand and Travelers' response, however, this case became more complicated by the two sides' subsequent conduct. Indeed, the undisputed record demonstrates that the appraisal process commenced without an agreement as to its scope. In its April 9, 2018, letter, Travelers appointed -- or "tentatively appointed," whatever that was intended to mean -- Koertge as its appraiser. The record also reflects that Conklin, Travelers' claims manager, contacted Koertge and Miller about the appraisal and provided

---

[5] Of course, if Travelers had engaged in the process *without* informing the Beers of its disputes about coverage, then the court might well agree with the Beers that Travelers could not stop the process or otherwise refuse to engage as to any of the categories of loss.

each with a copy of the April 9 letter. Moreover, despite receipt of the April 9 letter, indicating that Travelers was only willing to submit five categories for the appraisal process -- because those were the only categories for which Travelers solely disputed the amount of loss. For reasons unknown, the appraisal process then proceeded between the two side's appraisers as to all categories of loss.

In doing so, Koertge, as Travelers' appraiser and agent, plainly exceeded his scope of authority. Again, as set forth in the April 9 letter, Koertge's appraisal authority has been limited to the five categories on which Travelers agreed that only a dispute as to the amount of loss remained. Instead, Koertge, with Virella's assistance, engaged in a full appraisal, contrary to the terms of his engagement. While plaintiffs may well have believed (or wanted to believe) that Koertge was acting within the scope of his agency relationship, *see Kolbe & Kolbe Millwork, Co. v. Manson Ins. Agency, Inc.*, 983 F. Supp. 2d 1035, 1042 (W.D. Wis. 2013), in light of the April 9 letter from Travelers to the Beers, a reasonable jury could not find that there was a meeting of the minds as to the scope of the appraisal. In other words, the undisputed record demonstrates that the parties failed to initiate the appraisal process properly except as to the five categories to which *both* had agreed.[6]

As such, the court agrees with defendant that a reasonable jury could not find that defendant breached the terms of the Policy in failing to complete the appraisal process, at

---

[6] Defendant offers other bases for summary judgment in its favor, including the possibility that a hailstorm occurred after the policy period and caused the damage; Mr. Beer interfered in the process, tainting any award; and that the appraisal panel did not issue an award. In light of the court's finding that the appraisal process as to the full scope of claimed damages was not properly invoked, the court need not reach these issues -- other than to note that each also include disputed issues of fact.

least as to the nine areas of loss for which it had not agreed. To the same extent, plaintiffs' bad faith claim based on defendant's refusal to complete the arbitration process also fails. *See Brethorst v. Allstate Prop. & Cas. Ins. Co.*, 2011 WI 41, ¶ 65, 334 Wis. 2d 23, 798 N.W.2d 467 ("[S]ome breach of contract by an insurer is a fundamental prerequisite for a first-party bad faith claim against the insurer by the insured."). To the extent, if at all, Travelers' failed to honor its commitment to the appraisal process as to the five categories to which it *had* committed, then plaintiffs have established both a breach of contract and bad faith, leaving only damages to be decided.[7]

While defendant may not be liable for failing to complete the arbitration process, as to the other five (or six, if counting the facia) categories on which it withheld consent, defendant was nonetheless negligent in failing to manage its appraiser and ensure that he understood the limits placed on his role.[8] Moreover, plaintiffs were plainly damaged by this failure, having paid for the costs of their own appraiser engaging in a full appraisal, consistent with the actions of Travelers' appraiser. As such, the court would be willing to allow plaintiffs to amend their complaint to add a claim for injury caused by defendant's failure to manage its agent and communications surrounding the appraisal process. Alternatively, the court would consider an alternative claim to bind Travelers as to those disputed loss categories to which it can establish a right of coverage.

---

[7] This would also be true as to the other three categories to which Travelers' expressed to dispute in its April 9 letter.

[8] Perhaps defendant would have a separate claim against Koertge for his failure to abide by the terms of the engagement, but that issue is not before the court.

Moreover, while the court will grant defendant's motion for summary judgment as to claims premised on the appraisal process, read broadly, plaintiffs' complaint still asserts a breach of contract and bad faith claim based on defendant's denial of coverage as to five categories of damage, assuming that defendant has at this point effectively denied coverage as to the roof and other disputed coverage areas. On those claims, plaintiffs may also pursue their breach of contract and bad faith claims at trial.[9]

ORDER

IT IS ORDERED that:

1) Defendant The Travelers Home and Marine Insurance Company's motion for summary judgment (dkt. #27) is GRANTED IN PART AND DENIED IN PART as set forth above.

2) Plaintiffs' motion for partial summary judgment (dkt. #30) is GRANTED IN PART AND DENIED IN PART as set forth above.

Entered this 28th day of August, 2020.

BY THE COURT:

/s/
_____
WILLIAM M. CONLEY
District Judge

---

[9] Citing to cases from other jurisdictions, defendant argues generally that plaintiffs failed to offer expert testimony about causation, but plaintiff disclosed David Miller as an expert, and he is in a position to testify as to his view of the cause of damage to the shingles and whether the entire roof needed to be replaced to address the damage.